# C.D.L. *vs.* M.M.L.

No. 06-P-1388.

Bristol. November 19, 2007. - June 27, 2008.

Present: Berry, Meade, & Sikora, JJ.

*Divorce and Separation,* Alimony, Child support. *Parent and Child,* Child support.

In the circumstances of an alimony award in a divorce proceeding, the range of income attributed to the husband by the judge was reasonable and supported by the findings and the trial records, especially where the husband, who was voluntarily unemployed, was earning less than he could with reasonable efforts, and where the husband had a historical capacity to earn a salary at a level close to four times the attributed income [152-157]; further, the husband failed to demonstrate that the judge neglected to address potential job markets and positions available to someone of the husband's age and specialized experience that would generate the level of income attributed to the husband [157-158].

In a divorce proceeding, the judge did not err in excluding the wife's investment income from the determination of her need for alimony, given that such a calculation would lead to an inequitable result where the wife, in lieu of alimony payments from the husband, would be required unilaterally to satisfy her needs and living expenses from investment income from the assets allocated to her as part of the division of property, whereas the husband had the capacity to earn income sufficient to meet both parties' needs without using his own investment income. [158-161]

This court remanded a matter to the Probate and Family Court for determination whether the judge's award of alimony to the wife improperly included certain child-related expenses and, if so, for adjustment of the alimony and child support orders as appropriate. [161-163]

In a divorce proceeding, the judge's award of attorney's fees to the wife was warranted, and the amount awarded was reasonable, given that the husband did not have a reasonable basis for refusing even to discuss any offer for child support and alimony, and given the husband's choice to pursue a lengthy trial on those issues. [163]

Complaint for divorce filed in the Bristol Division of the Probate and Family Court Department on March 26, 2001.

The case was heard by *Randy J. Kaplan,* J.

*H. Reed Witherby* for the husband.

*W. Sanford Durland, III,* for the wife.

BERRY, J. In ordering the plaintiff (husband) to pay alimony to the defendant (wife) in the amount of $711.54 per week, a judge of the Probate and Family Court attributed income to the husband. The husband formerly had been a partner in a large Washington, D.C., law firm, but by the time of the divorce proceedings had withdrawn from the firm partnership, was no longer practicing law, and was unemployed. The judge attributed income to the husband in an amount sufficient to meet each of the parties' "downsized" needs. Further, in determining the wife's financial need for support, the judge declined to adjust the husband's alimony obligations to account for investment income the wife might derive from the assets allocated to her in the G. L. c. 208, § 34, property division.

The husband challenges both the amount of income implicitly attributed to him and the judge's failure to consider the wife's investment income in determining her need for support. He also argues that the judge erred by improperly considering certain child support expenses in determining the award of alimony. While we decline to disturb the judge's findings concerning the attribution of income to the husband, and the judge's decision not to rely on the wife's investment income, we remand the matter to the Probate and Family Court so that the judge may determine whether the alimony and child support awards should be adjusted because of the court's apparent consideration of child-related expenses in fashioning the alimony award.

1. *Procedural and factual background.* We take the following factual background from the judge's findings, as augmented, where appropriate, by the trial testimony. Because they are directly pertinent to the rationale for the judge's attribution of income to the husband, beyond facts relative to the marriage history generally, we also set forth particularized details concerning the husband's legal practice, the positions he held, and the compensation the husband had earned as a practicing attorney.

The parties were married in June, 1973, and separated on December 26, 2000. There were three children of the marriage.[1] During the early years of the marriage, the wife worked as a

---

[1] The eldest child was twenty-four years of age and emancipated at the time of trial. The middle child, who resided with the husband, was twenty-one years of age, and would be emancipated upon his graduation from college in

school teacher while the husband completed law school. Upon the birth of the parties' eldest child in 1979, the wife ceased working and devoted herself to child care and homemaking activities.

With respect to the husband's work, upon graduating from law school near the top of his class, and following clerkships with the United States Court of Appeals and the United States Supreme Court, the husband embarked on what would become an extremely lucrative private law practice in the area of energy law. In 1983, the husband became a partner in a Washington, D.C., law firm where he specialized in the Federal regulation of gas and electric companies. In 1995, he made a lateral move to the Washington, D.C., office of a large Wall Street law firm to become the head of its energy department. From 1990 to 1995, the husband's average earnings were approximately $700,000 per year. Between 1996 and 2000 his annual earnings ranged from $500,771 to $658,241. During his last full year of practice with the Wall Street firm, the husband's highest billing rate was $540 per hour.

By the mid to late 1980's, the parties were in a financial position to enjoy a lifestyle commensurate with the husband's professional success. They purchased a very large house in Potomac, Maryland, and hired year-round domestic and yard maintenance help. They were able financially to take annual vacations, join clubs, and dine out often. As the children grew older, the parties purchased automobiles for each child and were able to pay fully for their children's private school and college expenses.

Sometime in the mid to late 1990's, the parties began to talk about "downsizing" their lifestyle in the future. Given the long hours, frequent overseas travel, and stress of his law practice — which the parties agreed were taking a toll on the husband and creating tension in the family — a major component of the downsizing plan was that, at some future point in time, the husband would leave the big law firm and move to a less stressful position. It was assumed by the parties that the husband's new position would yield less rich compensation than his big law firm practice. However, the plan was that the husband would earn

May, 2004. The youngest child, who resided with the wife, was seventeen years of age and a senior in high school at the time of trial, and planned to attend college.

sufficient income, and that to his income would be added income derived from the wife returning to work as a teacher. The parties anticipated that their combined incomes would yield sufficient revenues to support the family.

The judge found, however, that there was no consensus, and that the parties differed as to when the husband would leave the law firm, what his intended employment would be, and the amount of money that the husband would seek to earn in any new endeavor. The wife testified that it was her understanding that there would be no career change by the husband until the parties had mutually agreed upon a plan, and that it was her expectation that the husband would earn an annual income between $200,000 and $250,000. In contrast, the husband testified that the downsizing plan was to decrease the parties' living expenses to between $100,000 and $110,000 per year. This issue was not resolved at the time of the parties' separation.

In addition to the husband's work situation, the downsizing plan also included a change in residence. The parties discussed a move from the Washington, D.C., area to New England. This happened. In June, 1999, the parties purchased a home in Dartmouth, and moved there during the summer of 2000. In the initial months after the move and the sale of the Potomac, Maryland, house, the husband maintained an apartment in Washington, D.C., from which he commuted to work and traveled to the Dartmouth residence on weekends. But there were dissension and ongoing disagreements between the parties. On December 26, 2000, the husband left Dartmouth and did not return. This marked the beginning of the parties' ultimate separation, although for a time the parties did not acknowledge the finality of the divide.[2]

Days later, on January 3, 2001, without any notice to or discussion with the wife, the husband tendered his partnership resignation to the law firm. The husband testified that the parties had previously decided that he would leave his firm no later than January, 2001. The judge found to the contrary, and determined that there was no meeting of the minds between the husband and the wife on this point, and that the precise point of departure had not been defined.

---

[2]The husband filed a complaint for divorce in March, 2001.

Beginning in mid-January, 2001, the parties had no income and lived off their assets. In late December, 2001, the parties divided certain accounts that they used to pay for their living expenses; the husband used at least a portion of his monies to purchase a home in the Washington, D.C., area. Later, in 2001-2002, the wife, having updated her skills by taking several courses in special education, returned to the classroom on a part-time basis. She began full-time employment as a special education teacher in September, 2002, and at the time of trial in September, 2003, was earning $54,500 annually.

Since his January, 2001, resignation from his law firm, the husband has remained in Washington, D.C., where, according to the judge's findings, he has made only "minimal attempts" to obtain employment. The husband has applied (unsuccessfully) for jobs in areas in which, the judge found, he has no experience and that carry annual compensations of between $45,000 and $60,000 for legal positions and $75,000 for a position as an executive director of a nonprofit agency. He has made no attempts to interview with any law firms.

2. *Stipulation and agreement.* In May, 2003, the parties entered into a comprehensive stipulation and partial agreement that resolved many of the issues, including the division of the parties' real and personal property and the husband's law firm account. By the terms of the agreement, under which the parties equalized the division of their assets, each party was to receive approximately $636,982 from the anticipated sale of the Dartmouth home, $640,000 in non-tax deferred accounts, and $830,000 in tax deferred accounts. Each party further agreed to contribute the sum of $145,000 from their assets to educational accounts for the middle and youngest child (which sums the judge found would be sufficient to meet the children's remaining educational expenses). The stipulation and partial agreement of the parties were incorporated but not merged (except for child-related matters) in the judgment of divorce nisi. The issues of alimony and child support were contested and the subject of trial.

3. *The trial and the orders for alimony and child support.* Following a seven-day trial, the judge entered comprehensive findings and a judgment ordering the husband to pay alimony to

the wife in the amount of $711.54 per week commencing January 1, 2002, and child support for the benefit of the youngest child in the amount of eighty-seven dollars per week, commencing when the middle child graduated from college and continuing until such time as the youngest child graduated from college or attained the age of twenty-three, whichever occurred first.

In light of the fact that the husband had not worked for the three years preceding the divorce trial, and had no earned income, the judge's findings and orders concerning alimony and child support were, by necessity, dependent on an analysis that involved the attribution of income to the husband.[3] The award of alimony and the attribution of income to the husband as relating to that alimony award are a mainstay of the husband's appeal. To be noted is that, in this appeal, the husband does not challenge the judge's decision to attribute some income to him. Rather, the argument advanced by the husband seems to be that the attribution should have been limited to $75,000 (a figure the husband offered to stipulate to at trial), and that the alimony award should have been correspondingly reduced to match this $75,000 figure. As shall be discussed *infra*, we conclude that this proposed figure is too low, and we agree with the trial judge that the husband's attributed income should not be capped at $75,000. In challenging the attribution of income, the husband contends that the judge's analysis was incorrect because, or so the husband submits, his future employment prospects were not very good, he would not earn a lot of money, and the judge failed to consider lesser employment in attributing income.

In considering the issues presented on appeal, we first set

---

[3] The judge's findings on the husband's lack of employment are clear and direct.

"Since his resignation from [his former firm] the Court finds that the Husband has made minimal attempts to obtain employment. He testified that he has made no attempts to interview with any law firms since the separation. . . .

"Instead of working the Husband has chosen to substantially deplete his assets to pay for his expense. . . . Therefore the Court rejects his request that the Court enforce the 'agreement' that the parties had reached to allow him to substantially downscale his income and lifestyle. In fact, the only thing that the Husband has done in furtherance of this new lifestyle is to quit his job."

forth the judge's determinations concerning the alimony and child support to be awarded, and then turn to the attributed income analysis and the employment market question.

4. *The contested alimony determination.* The alimony and child support awards to the wife were based on the judge's calculation of the wife's expenses as follows:

> "The Wife's needs, according to her most recent financial statement, are $2,225 per week, or $115,700 [per year] . . . . She anticipates that her weekly mortgage expense for a home of comparable value to the Husband's will reduce to $578.00. This will reduce her expenses for herself and [the youngest child] to $97,136 [per year], a little less than the Husband's current expenses."

From this $97,136 annual figure for the wife, the judge deducted approximately $50,000, which reflects the wife's annual income from return to the work force as a teacher. In sum, the husband's combined annual support obligations to the wife (excluding certain minor miscellaneous expenses) were $41,524: $37,000 in alimony ($711.54 weekly) and $4,524 in child support (eighty-seven dollars weekly).[4]

Having calculated the alimony needs of the wife, the judge determined that attribution of income to the husband to cover this alimony and support was reasonable and justified. We turn then to the issue of attributed income.

5. *The attribution of income.* In the proper circumstances, "[a] judge is not limited to a party's actual earnings but may . . . consider potential earning capacity" when attributing income. *Heins* v. *Ledis,* 422 Mass. 477, 485 (1996). Attribution of income is particularly appropriate when a judge determines that a party (most often the primary earner and support provider) is voluntarily earning less than he or she is capable of earning through reasonable effort. *Kelley* v. *Kelley,* 64 Mass. App. Ct. 733, 741 (2005). Similarly, "[a]ttribution of income may be appropriate when a judge determines a career change is voluntary."

---

[4]Because the husband had not been paying alimony during the pendency of the proceedings, the judge's orders also directed the husband to make a lump-sum payment of alimony in the amount of $91,788.66 for the period between January 1, 2002, and June 25, 2004, the date the judgment was issued.

*Flaherty* v. *Flaherty*, 40 Mass. App. Ct. 289, 291 (1996). Both of these factors warranting attribution of income to the husband were present in this case. See generally *Schuler* v. *Schuler*, 382 Mass. 366, 374 (1981); *Canning* v. *Juskalian*, 33 Mass. App. Ct. 202, 206 (1992) ("[R]eflected in the case law is the principle that earning capacity of a parent [or spouse] rather than actual income may be considered in determining child support [and alimony] orders");[5] *Cooper* v. *Cooper*, 43 Mass. App. Ct. 51, 53 (1997).

In addressing the issue of attributed income to cover the husband's alimony and support obligations, the judge engaged in a thoughtful analysis of the parties' financial positions, annual expenses, and respective earning capacities, and made findings as to why an attribution of income to the husband was in order. In pertinent part, the findings and analysis of the trial judge, which we note are quite nuanced in respect to the attribution of income issue, provide as follows:

> "The Court finds that the Wife's expenses, and expenses for [the youngest child], are close to the amount that the Husband testified that the family would need in their new [downsized] lifestyle. A review of the Husband's financial statement also shows that he has expenses for himself and [the middle child] in the same range.[6] The Court finds that the Husband has an expectation of having a lifestyle

---

[5]The attribution of income to the husband in this case captures both alimony and child support orders. The husband focuses his appellate challenge on the alimony component. However, the attribution of income in the alimony context is not different in rationale from that in the child support context. In the area of attributed income in the child support context, see Child Support Guidelines II-C & H, and, in particular, Guideline II-H, which sets forth factors to be considered:

> "If the court makes a determination that a party is earning substantially less than he or she could through reasonable effort, the court may consider potential earning capacity rather than actual earnings. In making this determination, the court shall take into consideration the education, training, and past employment history of the party. These standards are intended to be applied where a finding has been made that the party is capable of working and is unemployed, working part-time or is working a job, trade, or profession other than that for which he/she has been trained."

[6]As to the husband's expenses, the judge found as follows:

> "The Husband's needs for himself and [the middle child], according to

with net expenses of approximately $100,000 a year. The Wife's request for an amount of alimony to maintain a similar lifestyle for herself and [the youngest child] is appropriate. The Wife cannot meet these expenses on her income alone. The Husband has taken no steps to diminish his anticipated lifestyle and therefore the Court will not diminish the Wife's lifestyle. The Court finds, as more fully set forth below, that the Husband has the ability to earn sufficient income for him to have this lifestyle for himself and contribute to the Wife's lifestyle for it to be comparable to what was discussed between the parties [in respect to the downsizing].

".  .  .  .

"The Court finds that the Husband has an ability to earn an income [to meet the needs of the wife and youngest child].  .  .  . The Court has the ability to attribute income to the Husband where it is determined that he is earning less than he could with reasonable efforts. In attributing income to the Husband the court has taken into consideration his education, training, employment history, and the parties['] agreement to downsize their lifestyle."

At the outset, and with much reliance upon *Flaherty* v. *Flaherty*, 40 Mass. App. Ct. 289 (1996), the husband contends that the judge made inadequate findings concerning the attributed income. We disagree. The particular findings quoted *supra*, as well as the remainder of the judge's detailed findings and analysis supporting the attribution, negate this contention. Contrary to the husband's comparisons, this case does not present the kind of flaws presented in *Flaherty*, where there was a wholesale omission of judicial findings to support the income attribution, and the record evidence did not support the attribution. Thus, in

his most recent financial statement, are $2,000 per week, or $104,000 per year. Once [the middle child] is emancipated [in May, 2004, upon graduation from college] it is anticipated that his [the husband's] needs will reduce."

(Though utilizing the needs figure found by the judge [$104,000] in arguing that the amount of income attributed to him was excessive, the husband noted correctly in a footnote in his principal brief that his needs and those of the middle child, as stated on his financial statement, were actually somewhat less.)

*Flaherty*, we reaffirmed the principle that income may be attributed, but we reversed the judgment because the judge in that case made "no specific findings" in support of the attribution; there was "no evidence that a change in [the husband's] job status was voluntary"; and there was countervailing evidence that the husband was "making a reasonable effort to secure additional income." *Id.* at 291. These flaws are not present in the instant case.

As previously noted, the husband believes that the attributed income should have been capped at the sum certain of $75,000, the amount the husband stipulated to at trial. The husband claims error in the judge's refusal to accept that figure, and her failure to set forth a sum certain figure for the attributed income.

It is by far the better practice for a judge, in attributing income to a party for purposes of alimony (or child support), to specify the amount, or define a reasonably finite range, of the income to be so attributed. Such specification sets defined economic points for the parties, serves as a marker should a party later seek to modify the alimony award, and provides a benchmark memorialized within the trial judge's rationale and findings which will facilitate appellate review. However, so long as the judge makes findings that provide evidentiary support for and set forth the underlying rationale for the attribution, and a financial analysis from which the range of attributed income is calculable, a failure on the part of the judge to set forth a sum certain for attributed income does not yield error per se so as to require reversal. In the first place, "[e]stimation is inherent in the attribution of future earnings." *Canning*, 33 Mass. App. Ct. at 211. Furthermore, there may be cases, such as this one, that frustrate the kind of mathematical precision for which the husband pushes in his appellate challenge to the judge's findings. It is much more difficult to quantify by a sum certain potential future income, in a case such as this, where there is no existing income baseline because the husband has not worked for several years prior to trial, following his voluntary withdrawal from partnership in the law firm in January, 2001. Thus, the judge had to deal with a zero annual income baseline, and had nothing from which to extrapolate in connection with the attribution of income.[7]

---

[7] At a posttrial hearing on a motion to stay the judgment, the husband

Given the difficulties presented in this particular case, not-withstanding that no sum certain was stated, the judge's find-ings, analysis of the parties' financial positions, and methodol-ogy for the income attribution provide a measurable range for the income attributed to the husband. Specifically, the findings and methodology were directed to determining the respective annual expenses of each of the parties (with adjustments for the wife's earnings from her return to teaching), and to attribute such income as would be necessary to meet these expenses. The judge noted that the annual expenses of the husband and wife were in the range of approximately $100,000 each. But, as to the husband's living expenses, the judge further found that "[t]he Husband has taken no steps to diminish his anticipated lifestyle," and that an attribution was in order so as not to "diminish the Wife's lifestyle," and to equalize the parties' lifestyles. From the combined annual expenses of $200,000, the judge subtracted the wife's approximately $50,000 in teaching income. This yields an attributed pre-tax income in the order of about $150,000, and with tax adjustments, the income attributed to the husband would most probably fall in the range of $170,000-$175,000.[8] In relation to what the judge sought to achieve in terms of equal lifestyles for the husband and the wife based on

pressed as a basis for the stay that he would be raising an appellate challenge to the income attribution, including that the judge had not stated a sum certain. In response to this contention, the judge commented that one reason she had not set forth a "*specific amount*" was that "nothing . . . was presented" during trial. The judge's point is well taken in that the evidence at trial indicated that the husband was not working and was without any income, i.e., the husband had a zero income baseline. Indeed, at the posttrial hearing, in responding to the husband's contention about the absence of a specific amount, the judge observed as follows:

> "I had difficulty as to what was presented to me by both [the husband's] expert [and] . . . his figure that he was obviously earning $75 thousand a year, but there was not a figure that I could pick. [Instead], I made the finding . . . that he had the ability to pay the order which I have to say and I said it in my findings, [is not] an extraordinary order [under] the circumstance."

[8]The husband estimates (and from that estimate, complains) that the financial effect of annual alimony and child support, when added to the husband's own annual living expenses, translates to approximately $190,000 in attributed income. Even if this were an accurate estimate — which it is not — in light of the husband's past substantial earnings, that figure may have been sustain-

the corresponding equal annual expenses of both, and with consideration of the parties' disproportionate potential future earning capacities, the judge expressly found "that the Husband has the ability to earn sufficient income for him to have this lifestyle for himself and contribute to the Wife's lifestyle."

In light of all of the foregoing, and giving special weight to the judge's finding that the husband was "earning less than he could with reasonable efforts," see *Kelley*, 64 Mass. App. Ct. at 741, and especially in light of the husband's historical capacity to earn at a level close to four times the attributed income, we conclude that the range of attributed income to the husband by the judge with respect to alimony was reasonable and supported by the findings and the trial record.

6. *Potential jobs and markets for the husband.* In further contesting the attribution of income, the husband argues that the judge failed to address potential job markets and positions that would be available to someone of the husband's age and specialized experience at the level of income attributed to the husband.

We discern no error. The judge considered these issues and made such findings as were necessary, all of which are supported by the evidence. In her findings, the judge considered employment prospects and potential income commensurate with the husband's education, training, and employment history, including his past earnings. Reduced to essentials, the judge found that the husband has an ability to obtain employment in several fields, including the law, which would yield sufficient income. The judge was not required to point to a specific position or job opening. Cf. *Bassette* v. *Bartolucci*, 38 Mass. App. Ct. 732, 734-735 (1995).

To illustrate: the judge considered the employment market in Washington, D.C., where the husband had purchased a home

---

able. The delta between the figure that is addressed in this appeal, $170,000-$175,000, and the husband's estimate of $190,000, is not great. In any event, the husband's estimate is too high, and is based on a miscalculation of the expenses listed on the husband's financial statement by ignoring, for example, that a portion of the husband's expenses — expenses associated with the middle child living with the husband, such as the child's food, clothing, automobile insurance, unreimbursed medical expenses, etc., would be reduced, as the judge found, upon the middle child's emancipation by graduation from college in May, 2004.

and in which the judge found the husband might put his long-standing and accomplished skills to work at a quite good salary. Pertinent to a potential job placement in that market, the judge found that the husband's own testimony and that of his expert, Ronald Cullis, "only enforced the Court's position that the Husband has substantial skills in law and in other areas."[9] Of further weight on these issues is the judge's finding that the husband has failed to take reasonable steps even to test, for example, the legal or corporate job markets during the three years following his resignation from his firm.[10] Indeed, the judge noted that the husband to date had only applied for jobs in areas for which he had little or no experience.[11,12]

7. *Investment income.* The husband argues that the judge committed error by excluding the wife's investment income from the

[9]In his brief, the husband heavily relies on the testimony of Cullis, who was a consultant for attorney placement. In the husband's direct case, Cullis opined that while the husband had "been very, very successful and effective in satisfying the needs of clients and doing it efficiently and in a reasonably cost-effective way," the husband would have a difficult time being accepted into the partnership of a new law firm because of his age and the fact that he no longer had a existing client book of business. However, on cross-examination, Cullis acknowledged that the husband's "real technical capabilities" and his familiarity with the "whole energy regulatory side and working with energy companies doing energy deals" were skill sets that could be transferable to other law areas. For example, Cullis stated that a corporate environment is often a more "family friendly" environment than a law firm for lateral transfers, and that he had seen successful former partners of law firms (such as the husband) transition into an in-house position in a corporation's general counsel's office.

[10]If, after diligent search for more remunerative employment, "the judge's predictions concerning the husband's future employment [and earnings] fail to materialize," the husband would not be precluded from filing a complaint for modification. See *Gordon* v. *Gordon*, 26 Mass. App. Ct. 973, 975 (1988).

[11]The husband testified that he applied to teach in various high schools in the Washington, D.C., area, though he had never taught before. Similarly, the husband applied for a position as an appellate lawyer with a public defender's office though he had no criminal experience.

[12]The husband also argues that the judge failed to consider adequately that he has health problems which may impact upon his ability to obtain employment in a law firm. That is not so. The judge, noting that the husband himself had testified that he would be able to work forty to fifty hours per week (as long as his employment did not involve late-night work and long and frequent travel), found specifically that the husband's ailments would not prevent him from working a full-time job, including the practice of law.

determination of her need for alimony. According to the husband, the wife can generate a stream of investment income from the assets allocated to her in the divorce. This investment income, when coupled with the wife's teaching salary, the husband argues, should be applied as a supplement to meet the wife's annual financial needs and correspondingly reduce the husband's alimony obligation.

"The focus of any financial award must include 'the crucial issue in an alimony dispute, namely, the [spouse's] need for support . . . *in relationship to the respective financial circumstances of the parties*' " (emphasis added). *Grubert* v. *Grubert*, 20 Mass. App. Ct. 811, 819 (1985), quoting from *Partridge* v. *Partridge*, 14 Mass. App. Ct. 918, 919 (1982). An award of alimony may be appropriate, even if the receiving spouse can generate income from the estate awarded her by the divorce, because "[m]any considerations shape the structure of an award." *Johnston* v. *Johnston*, 38 Mass. App. Ct. 531, 537 (1995). See *Rosenberg* v. *Rosenberg*, 33 Mass. App. Ct. 903, 904 (1992). Cf. *Moriarty* v. *Stone*, 41 Mass. App. Ct. 151, 159 (1996).

In declining to "factor in" the wife's investment income from her assets to meet the wife's financial needs, the judge quite clearly and directly considered the alimony calculation in relationship to the respective financial circumstances of the parties. See *Johnston*, 38 Mass. App. Ct. at 537. In these respects, the judge found that the equal division of assets, which was a part of the stipulation and agreement between the parties (see part 2, *supra*) did not, in ultimate effect, put the wife in anywhere near an "equal" financial position with the husband, given the extraordinarily great differential in their earning capacities. Continuing, the judge found that by mutual agreement of the parties, the wife, at age fifty-three, had not over the past decades developed an increasing earning capacity, but rather had just rejoined the workforce after a twenty-year absence, and "will never have the ability to earn anywhere near the income level of the Husband." Therefore, the judge determined that the husband should be a contributor to her economic needs by alimony payments calculated without a reduction on account of the assets allocated to the wife. In addition to the just quoted finding, other salient findings on this issue state as follows:

"The Court finds that the Wife should not have to rely on her assets received as her share of the divorce settlement to maintain her standard of living. The Husband is 53 years of age and the Court does not support his position that he can choose to remain unemployed or underemployed to the detriment of the Wife in this long term marriage.

"Both parties received substantially the same assets in the division of property and the Court does not attribute income to either party from these assets to maintain their current lifestyle. There was no testimony that the parties intended to rely on their assets during their downshift to meet their expenses. An equal division of assets does not put the Wife in an equal position with the Husband given the differential in their earning capacity. An award of alimony is based on the duty and ability of one spouse to support the other spouse. An award of a property division is based on the joint contributions of the spouse to the marital enterprise."

In our opinion, these findings and the judge's resulting determination not to include the wife's investment income in setting the alimony award, fairly address the inequitable result which would result were the wife, in lieu of alimony payments from the husband, required unilaterally to satisfy her needs and living expenses from investment income from the assets allocated to her as part of the division of property. This is in contrast to the husband, who had the capacity to earn income sufficient to meet both parties' needs without using his own investment income.[13]

Given the considerable discretion accorded a judge in fashioning an alimony award pursuant to G. L. c. 208, § 34, see *Bernier v. Bernier*, 449 Mass. 774, 793 (2007), we cannot say that the judge's refusal to "factor" the wife's investment income in determining the wife's needs constitutes error.

A final comment is in order. Notwithstanding the judge's

---

[13]The judge also found that although each party should have received similar income from the assets received by them, the husband (unlike the wife who obtained employment pursuant to the parties' decision to downsize) dissipated more of his assets than the wife based on his choice to remain unemployed. In listing this as a reason for declining to rely on the parties' income streams, it would appear that the judge, among other things, did not wish to penalize the wife for her diligent search for employment.

refusal to "factor" in the wife's investment income for purposes of alimony, there is a real possibility in this case that the wife will be unable to meet her downsized needs (even if fixed at an amount somewhat less than $97,000) without utilizing a portion of the investment income flowing from the assets allocated to her in the divorce. The wife's employment income ($54,500) and the alimony award ($37,000) are fully taxable to her.

8. *Child-related expenses included within wife's needs.* The husband argues that the wife's financial statement and admissions at trial demonstrate that the judge erroneously included $23,000 of expenses related to the youngest child and approximately $6,000 of nonexistent expenses in determining the award of alimony.[14] He asserts that the wife's needs actually approximate $68,000, not the $97,000 found by the judge. The husband contends that the inclusion of any of these child-related expenses as a factor in the determination of alimony was legal error.[15] See *Saia* v. *Saia*, 58 Mass. App. Ct. 135, 137-138 (2003) ("Alimony

---

[14]By an order dated March 24, 2005, a single justice of this court allowed, in part, the husband's motion for stay of the alimony award of $37,000, noting that it appeared that $17,577 (actually $17,597) of child-related expenses (consisting of medical expenses for the child in the amount of $3,073 and child care expenses of $4,524 and approximately $10,000) was erroneously included in the alimony award. The single justice ordered that $17,577 of the yearly alimony award be stayed pending appeal and that the husband pay the wife, as alimony, $373.50 per week pending appeal.

[15]In his brief, and in a letter to this court dated November 28, 2007, in response to questions put to the husband's counsel at oral argument, the husband identifies three categories of child support expenses which, he asserts, are included within the wife's needs of $97,136.

First, the husband argues that the wife listed on her financial statement, in a separate schedule of expenses exclusively for the youngest child, the amount of $10,114 ($194.50 per week); the judge found $9,048 of this amount to be unreimbursed child support expenses and ordered the husband to pay one-half that amount ($4,524, or eighty-seven dollars per week) as child support. The husband asserts that the judge failed to remove any of the $10,114 from the $97,136 needs figure.

Second, the husband asserts the judge included in the $97,136 needs figure medical and medical insurance expenses for the youngest child in the amount of $6,146, half of which ($3,073), under the parties' agreement, the husband was required to reimburse the wife. (But see section 5 of the agreement, where the husband agreed to pay to the wife one-half of the wife's "out-of-pocket cost to maintain [medical] insurance during the period in which one or both of [the youngest and middle child] are insured under said medical insurance plan and neither party is paying child support to the other.") The husband asserts

is governed by G. L. c. 208, § 34, which does not recognize expenses of caring for dependent children among the factors to be considered in determining alimony"). But cf. Child Support Guidelines II-A.[16]

Upon review of the record, it appears that certain child-related expenses may have been improperly or redundantly included within the $97,136 of total expenses upon which the judge based the alimony award. Remand to the Probate and Family Court is necessary so that the judge can determine whether there were any child-related expenses that were improperly included in the determination of the wife's needs for the alimony award, and if any such child-related expenses were so improperly included, the judge should adjust the alimony and child support orders, as the judge deems appropriate (see, e.g., our final comment to part 7, *supra*).[17] The judge may hold such further hearings as she deems necessary. Further findings of fact should be made.

As to the husband's other contention, we perceive no merit in

---

that these two categories of child-related expenses were included in the alimony award improperly and redundantly.

Third, the husband identifies an additional category consisting of the youngest child's portion of $26,728 in other expenses (which the husband has estimated as $10,000) that, the husband says, the wife testified she spent upon herself *and* the youngest child. The husband maintains that these expenditures, while not duplicative of child support expenses found by the court or agreed upon in the agreement, should have been considered as a basis for child support rather than alimony. (Contrary to the wife's assertion in her brief, the expenses to which the husband points are not, for the most part, "housing related" costs.) We recognize that there may be instances where it is simply impractical or unrealistic to parse an expenditure between a care provider and a dependent child who resides with the provider.

[16]Neither party has cited to or discussed Child Support Guidelines II-A, which provides, in relevant part: "So long as the standard of living of the children is not diminished, these guidelines do not preclude the court from deciding that any order be denominated in whole or in part as alimony or as a separate maintenance payment." To the contrary, on the issue raised, both parties cite to the *Saia* decision. We note that the youngest child had attained the age of eighteen at the time of the entry of the divorce judgment and that the judge did not purport to adhere strictly to the Guidelines.

[17]Although the husband does not request in his brief that the child support order be vacated, he agrees in his letter of November 28, 2007, that if the court reduces the alimony award, the child support award should be increased by one-half of the third category of expenses (see note 15, *supra*) because child support is the responsibility of both parties.

the assertion that the judge improperly considered nonexistent expenses.

9. *Attorney's fees.* The husband was also ordered to pay the wife (from his share of the net proceeds of the sale of the former marital home) the sum of $15,937.50 toward her legal fees. In determining that the husband should be responsible for the legal fees incurred by the wife from the commencement to the completion of the trial itself in the amount of $15,937.50, the judge found that "[t]he husband did not have a reasonable basis for refusing to even discuss any offer for child support and alimony" and, in addition, that the husband "chose to pursue a lengthy trial on the issue(s) calling several experts." We believe the award of attorney's fees was fully within the judge's discretion, the reasons for the award were warranted, and the amount awarded was reasonable. See *Moriarty* v. *Stone*, 41 Mass. App. Ct. at 159; *Downey* v. *Downey*, 55 Mass. App. Ct. 812, 819 (2002).

10. *Conclusion.* Paragraphs 2 through 4 of the judgment of divorce nisi (insofar as those paragraphs may be affected by resolution on remand by the probate judge of the three questions concerning the child-related expenses addressed in note 15, *supra*) are vacated. The matter is remanded to the Probate and Family Court for further proceedings on the three discrete questions in note 15, *supra*. In all other respects, the judgment is affirmed. Pending the entry of new orders, the judge may make such temporary orders as she may deem appropriate. See *Adlakha* v. *Adlakha*, 65 Mass. App. Ct. 860, 872 (2006). The wife's request for double costs and appellate attorney's fees pursuant to Mass.R.A.P. 25, as appearing in 376 Mass. 949 (1979), is denied.

*So ordered.*