NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

18-P-600                                        Appeals Court

D.B.  vs.  J.B.

No. 18-P-600.

Suffolk.     April 2, 2019. - March 17, 2020.

Present:  Hanlon, Desmond, & Shin, JJ.


Divorce and Separation, Alimony, Division of property, Child
    custody.


    Complaint for divorce filed in the Suffolk Division of the
Probate and Family Court Department on July 18, 2011.

    The case was heard by Joan P. Armstrong, J.


    Nancy A. Freed for the husband.
    Sandra E. Lundy for the wife.


    HANLON, J.  After a trial, a judge of the Probate and

Family Court issued extensive findings of fact and conclusions

of law, and entered a judgment of divorce nisi dated May 23,

2017.  The plaintiff husband, D.B., now appeals, arguing that

the judge erred in (1) failing to calculate appropriately the

defendant wife's, J.B., need for alimony; (2) failing to credit

the husband for thirty-seven months of pretrial alimony; (3)

dividing equally the husband's interest in an investment account; and (4) awarding joint legal custody of the parties' minor children, while granting the wife final authority for nonemergency medical decisions. For the reasons that follow, we vacate the portion of the judgment that relates to the durational limit of the husband's alimony payments, and we affirm the remainder of the judgment.

Background. The husband and the wife were married in October 1998; together they had three children.[1] The parties first separated in July 2011; the husband filed a complaint for divorce on July 18, 2011. A short time later, the parties reconciled. However, in May 2013, the parties again separated, and the husband pursued his divorce complaint.[2,3] After the

---

[1] Because the parties' oldest child was eighteen at the time the judgment issued, she was not included in the custody determination.

[2] The judge calculated the length of the marriage as 175 months, based on the number of months between the date of the marriage and May 3, 2013, the date the parties last resided together. The length of the marriage is not in dispute.

[3] On May 3, 2013, the husband obtained an ex parte abuse prevention order against the wife. See G. L. c. 209A. He alleged that the wife had threatened him with a knife in front of one of the children. Four police officers went to the marital home to remove the wife while the husband took the children to a Celtics game. None of the court papers relating to the abuse prevention order is included in the record. As a result, it is not clear whether there was a hearing after notice, or whether the initial abuse prevention order was extended and, if so, for how long.

separation, the children resided primarily with the husband in the marital home; the oldest child resided with the wife for a short time between September 2015 and January 2016, but then returned to reside in the husband's home.  In February 2014, by stipulation of the parties, the husband agreed to pay to the wife temporary support of $30,000 monthly; the stipulation characterized the support as alimony, and the parties agreed that the monthly payments would be "credited against the applicable durational limit of the Alimony Reform Act of 2011." The stipulation later entered as a temporary order.

The wife graduated with a college degree and was employed prior to the parties' marriage.  However, beginning with the birth of the parties' oldest child in January 1999, the wife became a stay-at-home parent; during the marriage she also hosted dinners and political fundraisers in the marital home for

---

However, in an October 10, 2013 stipulation between the parties (later incorporated into a court order), among other things, the husband agreed to vacate the provisions of the abuse prevention order that pertained to the children; the stipulation instead instituted a "no-contact" requirement -- prohibiting either party from contacting the other in nonemergency circumstances by "phone, electronic means or in person."  The stipulation provided that, if the wife violated the no contact order, the husband could seek a new abuse prevention order and the wife would not object; there was no reciprocal provision if the husband failed to comply with the no contact provision. While a stipulation that would prevent a party from being heard appropriately in a hearing on an abuse prevention order is concerning, neither side has raised the issue here and so we do not address it.

the purpose of developing the husband's business relationships. The wife brought with her into the marriage approximately $500,000; those funds were "incorporated into the marital enterprise," or used to acquire and grow marital assets.

The husband was the primary wage earner during the marriage, and the wife made significant noneconomic contributions that permitted the husband to focus on his career. She was the primary caregiver for the children during the early years of the marriage; the family later employed nannies and other household staff, and the wife remained intricately involved in the day-to-day running of the household and in coordinating the children's needs. At the time of trial, the wife's sole source of income was the temporary alimony the husband paid her.

The husband received a bachelor's degree and later a master's degree in business administration. He began his successful career as a consultant with a company, and later formed an investment firm (firm). The husband has been employed by the firm throughout the course of the marriage and was, at the time of trial, one of the general partners at the firm, which had a number of employees. The husband did not receive a regular salary from the firm, but instead, for the two years preceding the trial, he opted to take a monthly draw of $200,000.

The firm manages private equity accounts that invest in and manage various investment portfolio companies. Partnership investment entities hold the firm's interests in each of the portfolio companies. Each account has a set duration of ten years; after an account is established, the firm spends the first five years raising investment capital to fund the entity (in addition to the firm's initial investment). Once the investment goal is met, the account is closed and the management phase of the account begins. The following five years are then focused on the management and growth of the account, in order to provide a high return for the investors (and for the firm) when the various entities contained within each account are sold.

As a general partner of the firm, the husband had a mandatory capital commitment to establish an account; this required him to contribute his personal assets. Relevant here, the husband was personally obligated to contribute $2.4 million to a specific account, asset X. By December 2009, fundraising for asset X had been completed, and the management phase of asset X had begun. At the time of trial, $600,000 of the $2.4 million in capital committed to asset X by the husband had yet to be funded; because asset X was still in the management phase at that time, the judge found that the husband's interest in asset X was "illiquid." According to the husband, his commitment obligation to asset X would continue to be

outstanding until December 2019.[4]  Based on the husband's financial statement admitted at trial, the husband's general partnership interest in asset X was approximately $8.1 million (or forty percent of the firm's entire share).  The judge found credible the husband's testimony that he could not at the time of trial predict the circumstances of any future sale of asset X, including any profits or losses therefrom.

By stipulation of the parties, in October 2013, a guardian ad litem (reporting GAL) was appointed to investigate, evaluate, and report (with recommendations) to the judge issues relating to the care, custody, and parenting plan for the children.  A second GAL (consulting GAL) was appointed for the purpose of investigating and consulting with the reporting GAL.[5]  The two GALs filed with the judge a joint report dated December 18, 2014; however, only the reporting GAL authored the recommendations section of that report.

In her findings of fact, the judge concluded, after hearing the trial testimony of the reporting GAL and the wife's expert, that both GALs had failed in their investigations to comply with mandated GAL standards, and had acted outside of their roles as

---

[4] However, if both one-year extensions were exercised then his commitment to asset X would end December 2021.

[5] The parties also stipulated to the appointment of a separate GAL for the purpose of asserting or waiving the children's psychotherapist-patient privilege.

objective evaluators.  As a result, the judge concluded that the GALs' conduct undermined any perception of impartiality and created the impression that they were biased in favor of the husband -- which had a detrimental impact on the children.  In addition, according to the expert testimony, the GAL report omitted certain information gathered from interviews with the family and various others, and sometimes misconstrued statements by collateral witnesses interviewed during their respective investigations.[6]

After fifteen days of trial, the judge found that the wife had been the primary caretaker of the children during the marriage and that she had lost economic opportunities during the two decades she was a stay-at-home parent.  The judge declined to adopt the reporting GAL's recommendations (due to both GALs' questionable impartiality); found that "the presumption against awarding [w]ife shared legal and physical custody ha[d] been

---

[6] For example, all three children claimed that the husband was abusive to them during the time of the parties' separation -- prior to trial while they were in his sole custody; the reporting GAL dismissed these allegations.  Instead, he concluded that the children's statements were about trivial incidents that were uncorroborated.  The judge acknowledged explicitly the trial testimony of the mother's expert that it was absolutely essential that the children's statements be accurately recorded, and accurately reflected, in the GAL report.

rebutted;"[7] and found that the wife was in need of support, due
to her absence from the workforce for nearly two decades and a
diagnosed medical condition. The judgment of divorce nisi that
issued, relevant here, (1) awarded the parties joint legal and
physical custody of the children, and granted the wife final
decision-making authority with regard to the children's medical
care, due to the parties' inability to work collaboratively in
those matters in the children's best interests; (2) ordered the
husband to pay to the wife general term alimony in the amount of
$60,000 each month (representing thirty-four percent of his
gross income) until September 1, 2027; and (3) awarded the wife

---

[7] The judge found that the "knife incident constitute[d] a 'serious incident of abuse' in that [w]ife's behavior that evening placed [h]usband in 'reasonable fear of imminent serious bodily injury.'" Nonetheless, she concluded that the statutory presumption that it was not in the children's best interest to be placed in the custody of the parent who had committed the serious abuse had been rebutted. See G. L. c. 208, § 31A. She concluded, "There is no dispute that [the two minor children] are intelligent, mature and capable of articulating their wishes and desires. Both . . . have clearly and consistently expressed that they would prefer to reside primarily with [w]ife. There was ample evidence presented at trial that the limitations placed on [w]ife's relationship with the children has had a negative impact on each member of [this] family. . . . [Based on their ages, the two minor children's] preferences should be given significant weight. The children have also been thriving while residing primarily with [h]usband, and the [c]ourt finds no reason to limit his contact with them going forward. Due to the children's full and active lifestyles, the [c]ourt finds that a flexible, non-rigid parenting schedule is appropriate for [this] family. Enabling the children to enjoy liberal parenting time with both [p]arties within the parameters of the children's respective schedules is of paramount concern."

fifty percent of all distributions received by the husband derived from his interests in asset X. The husband appealed.

Discussion. 1. Wife's need for alimony. The husband first argues that the judge erred when she calculated the amount of his alimony obligation. For support, he cites the Alimony Reform Act of 2011 (act), St. 2011, c. 124, which provides, in pertinent part, "[e]xcept for reimbursement alimony or circumstances warranting deviation for other forms of alimony, the amount of alimony should generally not exceed the recipient's need or 30 to 35 per cent of the difference between the parties' gross incomes established at the time of the order being issued" (emphasis added). G. L. c. 208, § 53 (b). The husband's argument focuses particularly on the word "or," which, he contends, "is critical." In his view, the award must satisfy both criteria. And, he argues, the wife does not need the amount of alimony that the judge ordered him to pay. As to that second portion of his argument, we are not persuaded.

The act did not change the fundamental purpose of alimony, which "is to provide for postdivorce economic support of a spouse who was financially dependent during the marriage." Hassey v. Hassey, 85 Mass. App. Ct. 518, 524 (2014), citing Gottsegen v. Gottsegen, 397 Mass. 617, 623 (1986). "[W]here the supporting spouse has the ability to pay, 'the recipient spouse's need for support is generally the amount needed to

allow that spouse to maintain the lifestyle he or she enjoyed prior to termination of the marriage'" (emphasis added).  Young v. Young, 478 Mass. 1, 6 (2017), quoting Pierce v. Pierce, 455 Mass. 286, 296 (2009).  In determining the amount and duration of an alimony award, the judge must consider certain statutory factors, "and such other factors as the court considers relevant and material."  G. L. c. 208, § 53 (a).  Although the act created express guidelines to aid judges in fashioning alimony awards, "it [did] not alter the principle that the central issue relevant to a financial award is the dependent spouse's 'need for support and maintenance in relationship to the respective financial circumstances of the parties.'"  Hassey, supra at 524-525, quoting Partridge v. Partridge, 14 Mass. App. Ct. 918, 919 (1982).

We look to our cases establishing a child support order in higher income cases for some guidance in determining a spouse's need for alimony in a case where a party earns a substantial income.  That is, we have held that "consistent with principles underlying the [Massachusetts Child Support Guidelines (guidelines)], children's needs are to be defined, at least in part, by their parents' standard of living and that children are entitled to participate in the noncustodial parent's higher standard of living when available resources permit."  Brooks v. Piela, 61 Mass. App. Ct. 731, 737 (2004).  If there exists a

"material disparity in the standard of living in the respective parents' households," the ordered child support should, in furtherance of the principles of the guidelines, "provide the standard of living the child would have enjoyed had the family been intact." Smith v. Edelman, 68 Mass. App. Ct. 549, 554 (2007), quoting Brooks, supra (modification of child support denied as noncustodial parent's increased income postdivorce did "not result[] in a material disparity in the parties' respective lifestyles").

So, too, in calculating alimony, it is appropriate to view the need of a recipient spouse in light of the affluence of the family as a whole, keeping in mind the ability of the other spouse to pay. See C.D.L. v. M.M.L., 72 Mass. App. Ct. 146, 159 (2008) ("An award of alimony may be appropriate, even if the receiving spouse can generate income from the estate awarded her by the divorce, because '[m]any considerations shape the structure of an award.' Johnston v. Johnston, 38 Mass. App. Ct. 531, 537 [1995]"). Cf. Zeh v. Zeh, 35 Mass. App. Ct. 260, 267 (1993) ("The fact that the judgment provisions may meet the wife's basic needs does not preclude assessment of the fairness of the division of the assets of this long-term marriage, given both the apparent failure to weigh the effect of the wife's contribution as a homemaker and the size of the marital estate, as enhanced by the husband's inheritance from his father");

Rosenberg v. Rosenberg, 33 Mass. App. Ct. 903, 904 (1992) ("When the entire marital estate is as large as it is in this case . . . , need, even as related to station in life, recedes as a consideration").

It is apparent from the judge's findings in this case that she carefully addressed each of the considerations outlined in § 53 and concluded that the wife had a "significant" need for support from the husband in order to maintain the "upper-middle class to upper-class lifestyle" enjoyed by the parties during the marriage. See Zaleski v. Zaleski, 469 Mass. 230, 236 (2014) ("we examine a judge's findings to determine whether the judge considered all the relevant factors under G. L. c. 208, § 53 [a]"). The judge acknowledged that the wife had a college degree, but she properly took into account the fact that the wife had been out of the workforce for almost two decades, and also that she was not in the best of health. The judge further considered, among other factors, the wife's noneconomic contributions to the marriage, as well as the economic opportunities she had lost due to the parties' agreement that she would stay at home to parent their children. See G. L. c. 208, § 53 (a). As a result, given the husband's substantial ability to pay, and the wife's limited income and stated need for support, the judge permissibly determined that the wife needed the alimony in order "to maintain the lifestyle she

enjoyed prior to the termination of the marriage." Young, 478 Mass. at 7. By contrast, an award on these facts that focused on need for bare necessities alone would have produced a material disparity in the parties' postdivorce lifestyles.

It is true, as the husband argues, that the judge criticized the wife's statement of financial need.[8] Further, the judge noted that it was "incumbent upon [the w]ife to adjust her expectations following the divorce to reflect the reality of one income being shared between two households." However, the judge also noted that, during the marriage, the wife earned no income, and that, at the time of trial, her income derived exclusively from temporary support paid by the husband ($6,976.74 weekly). For this reason, she concluded that the wife had "no ability to maintain the marital lifestyle without continued support from [the h]usband."

As noted, a dependent spouse's "need" for postdivorce support is but one of the many factors to be considered by the judge in fashioning an alimony order. G. L. c. 208, § 53 (b). Here, although the judge was unable to determine the wife's "true need" based on her financial statement, given the discretion afforded by the act, it was permissible for her

---

[8] Specifically, the judge found that the wife's failure to complete her financial statement appropriately made it "impossible for the [c]ourt to precisely determine her true need as of the time of trial."

instead (or in addition) to consider the various mandatory and discretionary factors as prescribed by § 53 (a) to fashion an alimony award that would be appropriate in providing the wife the means to maintain the marital lifestyle.  This is precisely what the judge did here, and in so doing, "the judge quite clearly and directly considered the alimony calculation in relationship to the respective financial circumstances of the parties."  C.D.L., 72 Mass. App. Ct. at 159.  The alimony award was neither "plainly wrong" nor "excessive."  Zaleski, 469 Mass. at 236, quoting Heins v. Ledis, 422 Mass. 477, 481 (1996).  Ordering an alimony amount that constituted thirty-four percent of the disparity between the parties' determined gross incomes was well within her broad discretion.  See G. L. c. 208, § 53 (b).  See also Young, 478 Mass. at 5-6; J.S. v. C.C., 454 Mass. 652, 660 (2009) (support awards reviewed for abuse of discretion).

2.  Duration of husband's alimony obligation.  The husband next argues that the judge erred when she failed to credit him, as the parties had agreed, with the payment of temporary support for the thirty-seven months preceding trial.  We agree this was error.

"While Probate and Family Court judges enjoy considerable discretion, that discretion does not extend to vitiating a contract that was negotiated at arm's length and entered into

freely and voluntarily" by the divorcing parties.  DeMarco v. DeMarco, 89 Mass. App. Ct. 618, 623-624 (2016) (enforcing provisions of parties' surviving settlement agreement pertaining to alimony).  It is "important to respect the parties' 'freedom to contract' and that such agreements may serve a 'useful function' in permitting the parties to arrange their financial affairs 'as they best see fit.'"  Ansin v. Craven-Ansin, 457 Mass. 283, 288-289 (2010), quoting DeMatteo v. DeMatteo, 436 Mass. 18, 30 (2002) (enforcing contracted terms from postnuptial agreement).

On February 20, 2014, the parties entered into a stipulation that later entered as a temporary order.  Relevant here, one of the agreed-upon terms in the stipulation provided that "[c]ommencing on March 1, 2014 and on the first day of each month hereafter, the [h]usband shall pay $30,000 monthly as [t]emporary [s]upport to the [w]ife.  Said payments shall be characterized as alimony and shall continue until further order of the [c]ourt . . . and shall be credited against the applicable durational limit of the [act]."

As part of the May 23, 2017 divorce judgment, the judge ordered the husband to pay general term alimony for 123 months (based on 175 months of marriage, see note 2, supra), to terminate on September 1, 2027; this order ignored the parties' agreement to include the temporary support payments in the

durational calculation. See G. L. c. 208, § 49 (b) (3). The judge reasoned that the Supreme Judicial Court's holding in Holmes v. Holmes, 467 Mass. 653, 660 (2014), made it clear that "durational limits set forth in G. L. c. 208, § 49[,] appl[ied] to general term alimony awards only and [did] not apply to temporary alimony awards."[9] For that reason, given the Holmes court's conclusion that the Legislature's intent was not to include in "the maximum presumptive duration of 'general term alimony,' . . . the time period where temporary alimony was paid," Holmes, supra, the judge here concluded that she was "bound by the ruling in Holmes when setting the duration of any general term alimony award."

We conclude, however, that the procedural history in Holmes is distinguishable from what occurred here. In 2006, when the Holmes parties agreed that there would be temporary alimony, the act had not been enacted.[10] Holmes, 467 Mass. at 654. As a

---

[9] On April 2, 2014, the Supreme Judicial court decided Holmes, holding that, in that case, the husband's payment of temporary alimony did not afford him a credit against the maximum presumptive duration of general term alimony ordered in the judgment of divorce nisi. Holmes, 467 Mass. at 659-660. Eight days later, the wife in the present case filed a motion to modify the provision of the temporary order that had incorporated the 2014 stipulation, requesting that the duration of the husband's temporary support payments be excluded from the duration of general term alimony; that motion was denied.

[10] The act was passed in 2011 and went into effect on March 1, 2012. See St. 2011, c. 124, § 7.

result, the parties there had no reason to address the language of the act or to attempt to counter its effects by agreeing to any sort of credit to the husband's future general term alimony obligation for his pretrial alimony payments. See id. at 655. See also G. L. c. 208, § 49 (b). Both the stipulation and the divorce judgment in Holmes provided for the alimony payments to continue "until the death of the husband or the wife, or the wife's remarriage." Id. at 654.[11] In contrast here, the parties specifically had agreed that the husband would earn credit toward the durational alimony limits prescribed by the act for any pretrial support payments made to the wife. Because neither party challenges the validity of the agreement contained in the 2014 stipulation (and subsequent court order), the contracted terms are enforceable. Compare Ansin, 457 Mass. at 291 (minimum

_____

[11] In the Holmes case, "[a]fter the effective date of the . . . act, the judge issued a modified judgment . . . [and] modified the duration of alimony, ordering that the husband's payment obligation continue until the death of either party, the wife's remarriage, the husband's attainment of full social security retirement age, or October 7, 2020, whichever came first. In setting the termination date, the judge calculated the length of the marriage (fifteen years and seven days) and the maximum presumptive duration of general term alimony under the . . . act for a marriage of this length (twelve years), and ordered alimony to continue, subject to other contingencies, for the maximum presumptive duration. The judge did not subtract the time period in which temporary alimony was paid (two years, three months, and twenty-five days) from her calculation of the maximum presumptive duration of general term alimony." Holmes, 467 Mass. at 655.

criteria showing marital agreement made with consent of parties and not under duress).

The long-standing policy of allowing divorcing parties to enter into agreements that "may secure with finality the parties' respective rights and obligations concerning the division of marital assets, among other things," remains unchanged under the act (citation omitted). DeMarco, 89 Mass. App. Ct. at 623. See St. 2011, c. 124, § 4 (c) ("Under no circumstances shall said sections 48 to 55, inclusive, of said chapter 208 provide a right to seek or receive modification of an existing alimony judgment in which the parties have agreed that their alimony judgment is not modifiable, or in which the parties have expressed their intention that their agreed alimony provisions survive the judgment and therefore are not modifiable"). As a result, the reasoning in Holmes does not apply to this case, and the contracted terms of the 2014 stipulation are enforceable. The husband must be credited with thirty-seven months toward the durational limit of the general term alimony award.

3. Property division. The husband further contends that the judge erred when she equated his interest in asset X to stock options, and therefore when she divided equally with the wife that interest on an "if, as, and when" received basis. We disagree.

Under G. L. c. 208, § 34, a judge has broad discretion to divide the marital property equitably. Brower v. Brower, 61 Mass. App. Ct. 216, 221 (2004). "According [this] broad discretion to the judge's division of property pursuant to the § 34 factors 'is necessary in order that the courts can handle the myriad of different fact situations which surround divorces and arrive at a fair financial settlement in each case.'" Adams v. Adams, 459 Mass. 361, 371 (2011), quoting Rice v. Rice, 372 Mass. 398, 401 (1977). If the judge's conclusions are "apparent and flow rationally" from the record, we must uphold the division. Williams v. Massa, 431 Mass. 619, 631 (2000). "A judgment may be vacated only where the award is plainly wrong and excessive." Id.

The husband does not dispute that his interest in asset X is a marital asset subject to distribution under § 34. He challenges the judge's equal division of all distributions, when received, because, he claims, at the time of divorce there was an "agreed-upon, ascertainable, value" of the husband's interest.[12] However, the judge found that the husband's interest in asset X, which was in the management phase at the time of

---

[12] The judge declined to permit the husband to "buy out" the wife's share of the estimated value of asset X after the judge determined that the husband's financial statement did not support his claim that he was financially capable of doing so at the time of trial.

trial, was illiquid. In addition, at that time, less than seventy percent of the committed investment funds had been "called," and seven of the ten companies comprising the initial investment remained in the account; asset X was not due to close until December 2019, or December 2021 if the potential extensions were exercised. As the judge found, the husband's interest in asset X was tied inextricably to the portfolio companies within that account. Because, as the husband testified at trial, there was no way to predict the circumstances of any future sale of those companies, the timing of any sale of those companies, or the profits or losses resulting therefrom, the husband's interest in asset X could not be determined until the various sales of the companies held by the account were completed. See Haskell v. Versyss Liquidating Trust, 75 Mass. App. Ct. 120, 125 (2009) ("As valuation is a question of fact, the judge's determination of value will stand, unless clearly erroneous").

We discern no error in the judge's determination that the value of asset X was not ascertainable at the time of trial. See Adams, 459 Mass. at 376, quoting Baccanti v. Morton, 434 Mass. 787, 796 (2001) ("we are unwilling to deny one spouse, who contributed to the acquisition or appreciation of property during the marital enterprise, the right to share in what may be the most valuable asset between the spouses on the basis of the

uncertainty or future contingencies bound up in that asset" [quotations omitted]). See also Canisius v. Morgenstern, 87 Mass. App. Ct. 759, 765 (2015), quoting Adams, supra at 379 n.14 ("where a present valuation of [an asset] is uncertain or impractical, the better practice is to order that any future recovery or payment be divided, if and when received, according to a formula fixed in the property assignment").

4. Custody of the children. The husband finally argues that an award of joint legal custody of the children was error based on "overwhelming" evidence that the wife was unable to communicate effectively with the husband as to issues relating to the children. He also claims that the custody award was "entirely at odds" with the GALs' findings.

In deciding the issues of custody and parenting time, the best interests of the children are paramount. See G. L. c. 208, § 31. "The determination of which parent will promote a child's best interests rests within the discretion of the judge." Custody of Kali, 439 Mass. 834, 845 (2003), quoting Rosenberg v. Merida, 428 Mass. 182, 191 (1998). "[A] judge may consider any factors found pertinent to those interests in the circumstances of the dispute." Custody of Zia, 50 Mass. App. Ct. 237, 243 (2000). "The judge's findings in a custody case 'must stand unless they are plainly wrong,' or 'clearly erroneous'"

(citations omitted).  <u>Loebel</u> v. <u>Loebel</u>, 77 Mass. App. Ct. 740, 747 (2010).

Here, the judge acknowledged that, historically, the parties had had difficulty prioritizing the children's needs above their own, but she also found that, eventually, they were able to work out a flexible parenting plan.  The judge also found disingenuous the husband's accusation that the wife refused to communicate with him regarding the children in light of his abuse prevention order and the later no contact order. Finally, the recommendations in the GAL report, that the husband have sole legal and physical custody of the minor children, were permissibly rejected based on the judge's findings of "troubling" conduct by the GALs in acting "outside of their prescribed roles."

While a judge may consider a GAL's recommendations, the judge is required, as she did here, to draw her own conclusions in deciding the case.  See <u>Sagar</u> v. <u>Sagar</u>, 57 Mass. App. Ct. 71, 79 (2003).  In particular, the judge found that, during the marriage, the wife was the primary care provider for the children, and that at the time of trial both of the minor children wanted to live with her.[13]  Both children had

---

[13] The judge also found troubling the husband's apparent reason for involuntarily admitting the eldest child to a psychiatric hospital; he alleged she was "out of control" and

significant health issues, and when she was caring for them, the wife diligently had employed both homeopathic and western medicine options in providing for the children's health and wellbeing.  Both children had significant food allergies and sensitivities that the wife consistently took steps to mitigate and to prevent allergic reactions.[14]  In addition, the judge found credible the wife's testimony that the husband was disinterested in learning how to use the "Epi Pen" prescribed for the children due to their extensive food allergies.  After careful review, we discern no error in the award of joint legal custody, with final decision-making authority granted to the wife for the children's medical needs.

Conclusion.  So much of the judgment of divorce nisi, as supplemented by the first and second supplemental judgments of divorce dated November 15, 2017, as pertains to the duration of the husband's alimony obligation is vacated, and the matter is remanded for the entry of an amended judgment reflecting a reduction in the duration of the husband's alimony obligation by

---

"out of touch[] with reality" because she wanted to live with the wife.

[14] Among other steps, the wife taught the children how to read food labels and purchase food that would not trigger their allergies.  She also prepared and maintained "Remedy Bag[s]" containing "homeopathic remedies, Epi Pens, an inhaler and traditional first aid[] items."

thirty-seven months.[15]  In all other respects, the judgment of divorce nisi, as supplemented by the first and second supplemental judgments of divorce dated November 15, 2017, is affirmed.[16]

<u>So ordered</u>.

---

[15] On remand, the judge may consider that the amount of temporary alimony, for which the husband received a credit for purposes of the durational limits, is approximately one-half of the amount of alimony the wife is receiving pursuant to the divorce judgment.  We express no opinion whether the amount of alimony awarded after remand should or should not be adjusted as a result of our determination that the 2014 stipulation of the parties controlled.

[16] The husband's request for appellate attorney's fees is denied; the wife's request for appellate attorney's fees and double costs is denied.