GEORGE E. HASKELL *vs.* VERSYSS LIQUIDATING TRUST
& another.[1]

No. 03-P-59.

Norfolk. March 2, 2004. - September 13, 2004.

Present: KAFKER, KAPLAN, & MILLS, JJ.

*Corporation,* Board of directors, Stock, Transfer of shares. *Contract,* Consideration, Substituted contract.

In a civil action, the judge erred in concluding that a letter agreement signed by the plaintiff (the then president and chief executive officer of a corporation that was the defendant's predecessor in interest) lacked consideration and was unenforceable, and thus that the plaintiff was the owner of certain shares of stock, where consideration existed in that compliance with the letter agreement improved the plaintiff's tax situation, and in that the plaintiff agreed to the supersession and discharge of an earlier agreement by the terms of the letter in exchange for the erasure of a time limit on certain milestones and a provision for an independent valuer acting without a fixed criterion of fair market value for the shares of stock, thus making the letter agreement a substituted contract. [834-837]

CIVIL ACTION commenced in the Superior Court Department on August 7, 1995.

Motions for summary judgment were heard by *Charles M. Grabau,* J.; the case was heard by *Gordon L. Doerfer,* J., and final judgment was entered by *Patrick F. Brady,* J.

*John D. Hanify* for the defendants.

*Peter C. Knight* (*Tory A. Weigand* with him) for the plaintiff.

KAPLAN, J. In this declaratory action, it was first assumed by the parties that a certain letter agreement was binding and enforceable, with dispute arising as to its interpretation and operation. On motion for summary judgment, a judge of the Superior Court held the motion should be denied, as there were triable issues. Over objection, the plaintiff (defendant in

[1]Neal J. Harte.

counterclaim) was permitted to assert that the agreement lacked consideration and was unenforceable. This issue was tried and another judge held for the plaintiff, with the result (as will appear) that the plaintiff was declared the owner of certain shares of stock. On the appeal of the defendants, we shall reverse this ruling and remand the case to the Superior Court for further proceedings.

## NARRATIVE

1. David Keene, Thomas Wardell and Aubrey Easterlin formed Versyss, Inc., in 1989 (successor to an enterprise under another name) to engage in the business of developing software and related aids for the management of a variety of companies. Versyss was closely held, with no more than fifty shareholders, of whom three (as will appear) controlled a majority of the shares. By 1993 Versyss had 1,000 employees, a large customer base and $100 million in annual revenues, but it was encountering some serious financial problems.

David Keene and his son Russell (also deeply interested in Versyss) were acquainted with the plaintiff George Haskell. Haskell was known as a consultant of wide experience with computer-based businesses. The time seemed right to invite Haskell to work on a consultant's basis with Versyss; Haskell responded and undertook the job. In the early months of 1993, Russell together with Neal Harte (a long-time advisor to the Keene family to whom Russell had originally introduced Haskell) put on "full court pressure" to persuade Haskell to join the company full time. The arrangement would likely include the grant of some block of stock to Haskell; indeed, it appeared Haskell would have his eye on an ultimate 10% of Versyss's common stock.

In early April, 1993, Russell Keene had an extended discussion with Haskell. The outcome was an understanding, in principle, with particulars to be worked out, that Haskell would come in as CEO (succeeding Thomas Wardell) on the basis, apart from salary, of an immediately vested grant of 5% of the Versyss common stock (633,150 shares), with an additional 5% to be issued and become vested when the per share value attained $1.50. The $1.50 was ahead of the current value however

plausibly figured. It was the value at which David Keene (who died in January, 1993) had told Russell he would be content to sell the business. The 5%-5% arrangement seemed agreeable to Haskell and others and, after a conference with outside counsel in mid-April, 1993, the drafting job was committed to counsel.

2. On April 22, 1993, Haskell was elected a director, replacing David Keene, to serve on the board with Wardell and Harte (elected in early May). On May 11, 1993, this board of three consented, in lieu of meeting, to a resolution electing Haskell president and CEO of the company.[2] Also dated May 11, 1993, are a draft and revised draft of a "Summary of Intent vis-à-vis Stock Grants to Directors" from Deborah Dean, in-house counsel, addressed to Wardell. The "Summary of Intent" commences with the reference: "On April 14, 1993, you advised me that you, Neal [Harte] and George [Haskell] had reached agreement on the following matters relating to stock issuances." The Summary of Intent goes on to contemplate a grant of stock (apparently 5%) to Haskell, with a bonus plan under which Haskell might later secure additional shares (apparently 5%). Harte is accorded a grant and bonus right in one-half Haskell's amounts. There is special provision for Wardell.[3] The papers are initialed by the three directors.

There is another paper consisting of the minutes of a meeting of the board on the same day, May 11, 1993. Among the actions recorded are resolutions by which Haskell is appointed president and CEO, and (with Haskell abstaining from the vote) Haskell is to be issued "ten percent of the common stock of the Company . . . on a fully-paid, non-assessable, fully diluted basis," and Harte (with corresponding abstention) is to be issued five percent of such shares. These minutes were signed by Haskell as secretary pro tem. The minutes are anomalous in the face of the Summary of Intent. See notes 5 and 8, infra.

At all events, there was no issuance of stock in pursuance of these minutes.

3. Quite to the contrary, outside counsel continued with the

---

[2]Wardell resigned as CEO on May 11, 1993, remaining a director.

[3]Wardell was to receive stock, in addition to an amount he already held, which, after giving effect to the grants to Haskell and Harte, would cause Wardell's ownership percentage to remain unchanged.

task of carrying out the 5%-5% plan as it might evolve in fashioning the details. The drafting was delayed by other business. Finally, on December 14, 1993, a "Stock Purchase and Restricted Stock Agreement" (SPA) was entered into between Versyss and Haskell.[4] The SPA granted 1,266,300 shares (10%) of common stock to Haskell with 633,150 (5%) vesting immediately, and the balance, intended to be restricted according to certain terms of the agreement, to become vested and free of restrictions in accordance with the schedule of events set out in § 3.1 as follows:

| "*Vesting Event* | | *Shares Vested* |
|---|---|---|
| "(a) | Immediately | 50% |
| "(b) | The termination of the employment of the Employee by the Company with or without cause at any time earlier than the occurrence of (c),(d), or (e) below | * |
| "(c) | Achievement of the Milestone described in Appendix A attached hereto | * |
| "(d) | The death or disability of the Employee, or | * |
| "(e) | If earlier than the occurrence of (c) or (d), a Change of Control [defined in § 1.1]" | * |

"* That the number of shares which, when added to any shares issued pursuant to Section 3.1(a), will be equal to 10% of the issued and outstanding shares of the Company's common stock and those shares eligible for issue under all agreements outstanding as at the time of such event."

Appendix A of the SPA reads: "For the purposes of Section 3.1(a) [*sic*: should refer to (c)] of this Agreement, the occurrence or existence of all of the following Milestone [*sic*] prior to November 1, 1995 shall constitute the Vesting Event

---

[4]The SPA in § 2.1 speaks of "consideration" thus: "In consideration of past services and incentive for future services to be rendered to the Company. . . ." Section 4.1 disclaims conferring on Haskell, as "Employee," any right to continue in employment or ability to restrict Versyss's right to discharge him with or without cause.

described therein: The fair market value of the Common Stock shall have equaled or exceeded $1.50 at any time."

Harte entered into a similar SPA agreement with Versyss covering 5% of shares, of which 2.5% vested immediately with the balance to vest in the future according to schedule.

The board of directors of Versyss at its meeting on January 11, 1994, accepted and confirmed the foregoing SPA agreement and directed the secretary to issue shares accordingly. A certificate for 633,150 shares (5%) dated December 14, 1993, issued to Haskell (and presumably a certificate for half that number to Harte).[5]

4. In the circumstances of the SPA, Haskell (and Harte in similar case) could likely position himself for favorable tax treatment with respect to the shares not immediately vested by signifying an "election" under § 83(b) of the Internal Revenue Code, 26 U.S.C. § 83(b) (2000).[6] Haskell did claim the tax election by letter to the IRS dated January 14, 1994, describing the property as to which the election was being made as 633,150 shares of Versyss, at fair market value of $.01 per share, paid,

---

[5]These minutes of January 11, 1994, state that "the board wished to confirm the decision it made on May 11, 1993, . . . to issue common stock of the Company to [Haskell, Harte and Wardell]" and "[t]he board acknowledged that these Agreements [the SPAs] accurately reflected the board's decision of May 11, 1993, with respect to the number of shares to be issued."

We note that these mentions of May 11, 1993, appear to refer to the Summary of Intent of that date, not the minutes of the meeting of that date we have called anomalous.

[6]The trial judge wrote of § 83(b) that it "applies to the transfer of property in connection with the performance of services and determines the amount and timing of income tax for both the recipient and the transferor of such property. With respect to restricted property, if in some future tax year, there is no longer any 'substantial risk of forfeiture,' then a taxable event occurs, requiring the taxpayer to include in income in that tax year an amount equal to the excess of the fair market value of the property as of that date over the amount which that person paid for the property. 26 U.S.C. § 83(a). Under § 83(b), however, a person may elect to accelerate the year in which income is recognized. That is, a person may choose to recognize income in the year in which the restricted property is transferred, although the transfer would not normally be taxed under § 83(a) until a later year in which the restrictions lapse, if ever. Any appreciation which occurs between the transfer and the lapse of the restrictions will be treated as capital gains if the § 83(b) election is made, but as ordinary income if the election is not made. The § 83(b) election must be made 'not later than 30 days after the date of such transfer.' [26 U.S.C.] § 83(b)(2). This deadline cannot be waived."

subject to the restriction that these shares would vest "at such time the value of similar shares outstanding meets or exceeds $1.50 per share." Harte did not make an election under § 83(b).

Haskell's tax election gives "[t]he date on which property was transferred" as December 14, 1993; the letter embodying the election was dated January 14, 1994. Was, then, the election untimely under the clause of § 83(b) stating an election "shall be made not later than 30 days after the date of such transfer"? 26 U.S.C. § 83(b)(2) (2000). Haskell said the IRS had not told him the election was late and he had not thought about the effectiveness of his election until the present litigation. Nevertheless, the action the board went on to take on February 11, 1994, has a look of being responsive to the apparent loss of the tax advantage of § 83(b), Haskell through tardiness, Harte by omission to act.[7]

5. The February 11, 1994, consent of the board of directors in lieu of meeting records that the directors have reconsidered the SPA agreements of December 14, 1993, for Haskell and Harte "in view of certain possible and unintended financial consequences to the Directors as a result of the stock issuances to them in the manner set forth in the Agreements." This language was chosen by outside counsel, avoiding reference to taxes. A previous, evidently internal, draft had referred to "unintended tax consequences to Messrs. Haskell and Harte as a result of the stock issuances to them in the manner set forth in the Agreements." The directors resolved to rescind the SPA agreements and to issue stock "in a manner more consistent with the decision of May 11, 1993."[8] This called for the return of the shares issued under the SPA agreements, and the issuance of 1,266,300 shares (10%) to Haskell and 633,150 shares (5%) to Harte (with 94,478 for Wardell) — "stock in the previously-agreed upon amounts, but without the need for the Agreements or any similar document." The price was $.01 per share, justified in the resolution as reflecting the value of the common

---

[7]Ostensibly secure in (or perhaps indifferent to) his own tax situation, Haskell in his testimony suggested the restructuring of February 11, 1994, resulted from Harte's failure to elect under § 83(b). Harte resisted any implication that his omission to elect was inadvertent.

[8]Now the reference appears to be to the anomalous directors' meeting of May 11, 1993. Compare note 5, *supra.*

stock on May 11, 1993. The directors voting these resolutions were Haskell, Harte and Wardell, the former two being the subjects of the SPA agreements now intended to be rescinded.[9]

Stock certificates were not promptly issued. There was a significant intervention.

On March 14, 1994, Haskell and Harte signed a letter addressed to Mary Ann Keene (widow of David Keene), Aubrey Easterlin and Wardell, who together held at this time over 50% of the stock of the company. The letter is in one paragraph as follows:

> "It is understood by the undersigned that in the event that VERSYSS common stock does not reach the valuation of $1.50 per share as determined by an independent, outside valuation firm prior to our voluntarily vacating our positions at VERSYSS, that we agree to turn back one-half of our issued common stock to the Company and relinquish all claims regarding said stock in the future."

The title "President and Chief Executive Officer" appears under Haskell's signature and "Chairman of the Board" under Harte's.

The testimony of Russell Keene, Haskell and Harte about the setting of the March 14 letter appears gingerly and guarded, and there are manifest inaccuracies. (See Appendix.) But the origin or function of the letter is not obscure. Haskell and Harte used their board membership on February 11, 1994, to vote themselves the 10% and 5% of shares without restriction, thereby hoping to regain some tax advantage (reference to taxes, however, being delicately deleted from the corporate resolution). This act of self-accommodation was damaging to the other shareholders when considered in comparison to the previous SPA regime with its important milestone contingency regarding the second 5% and 2.5%.[10] So Russell Keene, representing his mother, inheritor of David Keene's shares, would see the

---

[9]If these resolutions were carried out, with the issuance of the shares without restrictions, a new tax event would have been created with potential for favorable tax consequences for Haskell and Harte.

[10]In the talk preceding the letter it was noted that if Haskell received unrestricted shares he might leave the company before the value rose to $1.50 and there would be a lack of shares available with which to attract a new CEO.

picture. The March 14 letter was a return to that regime, but with differences that could favor Haskell: note that under the letter the period for attaining the milestone was without limit of time, not closed off at November 1, 1995.

It was not until April 15, 1994, that stock certificates issued, dated back to May 11, 1993, to Haskell and Harte in the nominal 10% and 5% amounts. The shares were subject to the terms of the March 14 letter. The letter was taken into the company records. Paul Devlin, in-house counsel, sent an interoffice "confidential" memorandum to Haskell and Harte on May 10, 1994: "I have put in our corporate stock files a photocopy of your March 14, 1994, letter agreement regarding forfeiture of one-half of your common stock. . . . I assume that you have the [original], and there is no need for me to get the [original] *if the authenticity and validity of the [photocopy] (attached) [is] not in dispute.* If there is some question or dispute, please let me know immediately." (Emphasis supplied.)

6. Haskell's energy and ability were not doubted, but in the course of the next year he gradually lost influence in the decision of large issues of the company's future, as differences arose between Harte and himself. Should the company invite investment by outsiders or should it put itself on the block for sale? Haskell was strong for encouraging a bid by Alex Brown & Sons, Inc., to invest a substantial sum in the company. Harte appears to have favored sale over attracting investment, and in any event, if the investment route were followed, thought Haskell's postulated amount exceeded what was necessary or advisable. Haskell did not conceal his disappointment when the Alex Brown prospect petered out.[11]

7. On several occasions Haskell indicated he would resign if the company did not move aggressively to adopt one or other option he favored. On February 17, 1995, Haskell wrote to Harte outlining a series of conditions for his agreeing to remain with the company. One principal condition read thus: "I want my stock to be free of the $1.50 value letter under the circumstances I am agreeing to. Therefore, by this agreement, I will have no conditions on my 10% ownership portion. In addi-

---

[11]An offer of purchase from Medic Computer Systems, Inc., also failed to work out.

tion, I have fully paid for my stock." There was no progress toward agreement. Haskell by letter to Harte dated February 22, 1995, resigned "under protest."[12] The board of directors, now Harte, Russell Keene, and Charles Stevens, wrote to Haskell on March 8, 1995, about the possibility of negotiating a termination package but noted, "In the absence of such an arrangement, we have no choice but to abide by the terms of the arrangement concerning your stock, and we intend to take appropriate action to cancel half of your shares." A termination package did not eventuate. Following the terms of the March 14, 1994, letter, the company engaged Gordon Associates, Inc., as an outside independent valuer of the common shares. Gordon on September 7, 1995, reported a value as of March 1, 1995, of $.02 per share. On August 7, 1995, Haskell commenced the present action naming the company as defendant, which as pleaded sought a judgment declaring that, under the terms of the letter of March 14, 1994, Haskell was entitled to the full 10% portion of the common stock.

8. The story ends with an agreement and plan of merger involving Versyss, Physicians Computer Network (PCN) and PCN's wholly owned subsidiary Pine Acquisition Corporation. By rough shorthand expression, it is said PCN was acquiring the Versyss shares at a value of $1.52 per share. At a meeting on October 25, 1995, the Versyss shareholders approved the agreement, and another agreement setting up the Versyss Liquidating Trust (Trust). (A special standstill arrangement permitted Haskell to vote the entire 10%.) By an uncontested motion under Mass.R.Civ.P. 25(c), 365 Mass. 771 (1974), the Trust as "real party in interest" on May 8, 1996, substituted for and succeeded Versyss as defendant in the present action. The Trust represents the interests of the (former) shareholders of Versyss, particularly in the distribution of any avails of the merger due to them. It is understood that such avails owing upon the 5% shares in dispute here are held as an escrow.

9. Haskell considered that the March 14 letter embodied an agreement binding on him and enforceable by the addressee

---

[12]A file memo from Harte describes his meeting with Haskell on February 16, 1995, as amounting to resignation on Haskell's part. Haskell wrote on February 21 indicating he had not then resigned.

majority shareholders. This is evident from his letter of February 17, 1995, in which he spoke of wanting to secure relief from the burdens of the March 14 letter (and pointed to the securing of this relief as a major factor in his decision whether to remain with the company).

Just as Haskell understood himself to be bound, so the present action proceeded on the basic assumption by both parties that the March 14 letter marked an enforceable commitment, although not without dispute as to its precise meaning. The parties in dispute were Haskell, on one side, and on the other, engrossing and including the majority shareholders, the shareholders at large of the company represented by the Trust. In dispute were the proceeds of the merger attributable to 633,150 of the Versyss shares, being one-half the shares nominally issued to Haskell on April 15, 1994. The points open to dispute related to the interpretation and operation, not the validity, of the March 14 letter: the chief question was the meaning of value as comprehended in the word "valuation" — was it "investment value" or "fair market value" (and whether on proper valuation the shares scored $1.50 before Haskell's resignation); questions possibly arising were whether the Gordon firm could figure as an "independent" valuer, whether Haskell was entitled to collaborate in the selection of such a valuer, whether Haskell's resignation was "voluntary" when "under protest."

## PROCEEDINGS

Proceeding on the basic assumption mentioned, the action passed through an extensive pleading stage outlined in the margin,[13] followed by cross motions for summary judgment. It will be enough to say that the judge denied Haskell's motion on the stated ground that genuine issues of material fact existed,

---

[13]In outline: complaint, answer with counterclaim, reply to counterclaim with much discovery before cross claims for summary judgment. As noted, plaintiff Haskell failed on his motion on a count of his complaint against the Trust for a declaration of ownership; the defendants Trust and Harte succeeded on their cross motion against a further count of the complaint charging them with breach of fiduciary duty to furnish Haskell with certain information. Neither ruling is under review on this appeal.

under the March 14 letter sued on, (1) whether the Gordon firm qualified as an independent valuer, and (2) as to the proper interpretation of the term "valuation." The decision was dated October 6, 1996.

On May 9, 1997, Haskell performed an about-face and moved to amend his reply to the defendant Trust's counterclaim for breach of the March 14 letter to allege that the letter was unenforceable for lack of consideration. The Trust opposed the attempted change of theory as untimely, for the action had acquired age, the period for discovery had nearly expired, and the theory, if available at all, was so from the beginning. The judge allowed the motion to amend on July 9, 1997.[14]

So the action went to trial, jury-waived, commencing on March 1, 2000, before another judge. After discussion with counsel, the judge put apart the disputed issues of fact reserved from the denial of Haskell's motion for summary judgment, and tried the issue emerging from the claim about lack of consideration to bind Haskell's undertaking in the March 14 letter. The trial took five days; the record, heavy in documentary evidence with testimony by Haskell, Keene and Harte, is summarized in the narrative, *supra*. The narrative is consistent with and in some respects elaborates upon the judge's findings. We differ from the judge as to the conclusions that should follow.

### ENFORCEMENT

In holding the March 14 letter to be unenforceable — merely a "moral obligation" that could (perhaps with a qualm?) be simply ignored — the trial judge took the resolutions of February 11, 1994, to establish a grant of full ownership of the 10% to Haskell; the later letter, then, detracted from the grant by imposing restrictions upon it and exacted promises from Haskell without offering anything in exchange. Even in this narrow perspective, however, consideration existed, once account was taken of the vulnerability of the resolutions to an attack based on the directors' self-dealing and its effect on the interests of

[14]The ruling is attacked as part of the present appeal. We pretermit the question, preferring to reach the merits. We also pass by the claim that Haskell should be estopped from disavowing a position he long maintained regarding the letter in dispute.

the shareholders at large.[15] Compliance with the letter would improve Haskell's situation, and without undue cost, as he was pretty confident, so he said, that the milestone would soon be achieved.

On a fuller statement of the circumstances as of March 14, consideration is again shown to be present to support the letter agreement. On that date the 10% shares had not issued and the SPA was still in force as a executory agreement. Facing Keene, who spoke for major shareholders, Haskell would understand that to give effect to and act under the February 11 resolutions could hardly be defended as a corporate act helpful to the whole body of shareholders. Accordingly he agreed to the supersession and discharge of the SPA by the terms of the letter which, although renewing with changes a milestone contingency for the second 5%, introduced features that Haskell could judge favorable to himself — besides the erasure of a time limit on reaching the milestone, note the provision for an independent valuer acting without a stated fixed criterion of fair market value, whose decision would presumably be final if free of fraud.[16] The replacement of an executory agreement by another such agreement binds the latter where the changes are material, even if modestly so. The rule urged on the judge below goes by the name "substituted contract." "The term *substituted contract* is used to describe the transaction [of consideration-supported discharge] if what the obligee accepts is a promise, whether offered by the obligor or a third party. . . . Again, as long as the promised performance differs in some way from what is due, there is consideration for the discharge." 1 Farnsworth, Contracts § 4.24, at 544 (2d ed. 2000). "A substituted contract is one that is itself accepted by the obligee in satisfaction of the original duty and thereby discharges it. A common type of substituted contract is one that contains a term that is inconsistent with a term of an earlier contract between the parties." Restatement (Second) of Contracts § 279, comment a

---

[15]We speak here of a standard of duty applicable within an ordinary commercial corporation without having to invoke any higher standard ("uberrima fides") for a close corporation.

[16]See *Palmer* v. *Clark*, 106 Mass. 373, 389 (1871); *Krauss* v. *Kuechler*, 300 Mass. 346, 349 (1938); *Cambridge Street Metal Co.* v. *Corrao*, 30 Mass. App. Ct. 150, 155 (1991).

(1981). See 29 Williston, Contracts § 73.36 (4th ed. 2003). For Massachusetts examples, see *Zlotnick* v. *McNamara*, 301 Mass. 224, 226-227 (1938); *E. Van Noorden Co.* v. *Hartford Roofing & Sheet Metal Co.*, 336 Mass. 676, 677-678 (1958); *Adams* v. *Herbert*, 345 Mass. 588, 590 (1963); *Baldwin's Steel Erection Co.* v. *Champy Constr. Co.*, 353 Mass. 711, 715 (1968). When finally issued on April 15, the shares bore the weight of the letter, part of the corporate record.

The judge refused to enforce the March 14 letter because, so he argued, to enforce it would involve the court in a tax sham. The resolution of February 11, granting unrestricted ownership of the 10% and 5% of the shares to Haskell and Harte, purported on its face to create the new event that would save them taxes much as § 83(b) would have done if it had been properly invoked. In the judge's conception, "to engraft the March 14, 1994, letter onto the deal would make it a complete tax sham by allowing the parties to claim on the one hand that there was no future event which could enable the company to get back its stock and on the other hand asserting that such a right was preserved by the side letter agreement."

But it cannot be known or forecast on the present record that Haskell would attempt thus to act toward the tax authorities. Upon insistence by Keene on behalf of the major shareholders (as described *supra*), Haskell could well have entered into the letter agreement while accepting the risk of the consequent loss of a tax advantage. So also it seems unwise for the court to anticipate what the IRS might think or do about the tax situation. The court should "stick to its last" and enforce the letter, leaving any tax results or sanctions to the authority and expertness of the agency. For the factors involved in such a choice, see *Town Planning & Engr. Assocs.* v. *Amesbury Specialty Co.*, 369 Mass. 737, 745-746 (1976); for application, see *Kelly* v. *Kosuga*, 358 U.S. 516, 519-520 (1959); *Ets-Hokin & Galvan, Inc.* v. *Maas Transport, Inc.*, 380 F.2d 258, 260-261 (8th Cir.), cert. denied, 389 U.S. 977 (1967). All the more should the court yield place to the agency because refusing to enforce the letter must have curious aftermaths: it would add to the chance that Haskell would secure the very tax break, at the same time being relieved of proof of the attainment of any milestone, and taking

down a larger share of the escrowed fund than he rightly deserved.[17]

The declaration vesting ownership of the disputed 633,150 shares of Versyss, Inc., in the plaintiff Haskell is reversed, and the case is remanded to the Superior Court for further proceedings.[18]

*So ordered.*

APPENDIX.

Haskell said he did not recollect any discussions about a side letter before March 14, 1994, or any discussion about tax issues. At a meeting in Haskell's office on March 14, with Russell Keene and Harte also present, Keene spoke of a difficulty if Haskell left the company with all his stock and not enough shares then available to be offered to attract a new CEO. His dad thought $1.50 a share might be a good price for a sale of the company, so would Haskell be willing to sign something that said, if the company did not reach that market value, Haskell would voluntarily give up one half his shares (thus helping on the CEO problem). Haskell denied expressing willingness to confirm to the major shareholders that in the circumstances of the February resolutions he would supply a side letter. The March 14 letter was put together by the three of them at the meeting with much drafting.

Russell Keene said he had (rather casual) conversations with Haskell and Harte about restructuring for tax reasons. As to the content of the March 14 letter, he had one conversation with Haskell in the January, 1994, time frame and the other on March 14. He thought the March 14 letter was consistent with the agreement he had reached with Haskell on or before April 14, 1993 (date of the Summary of Intent). All the members of the board of directors participated in drafting or discussing the March 14 letter.

Harte was asked, "Didn't the Board of Directors on February 11, 199[4], vote to issue the stock without any side agreement to Mr. Haskell?" Harte answered, "I'd have to say no to that." Harte had many discussions with Russell Keene about shares for a new CEO. He did not recall a discussion with Keene and Haskell at the latter's office about the March 14 letter. The letter completed the transaction. He had received a draft of the letter. He does not know who drafted it.

---

[17]Following the substitution of the Trust for the company as real party in interest, there is no difficultly in the Trust's enforcing the letter agreement, as the true contest over ownership of the disputed shares is between the plaintiff Haskell and the body of shareholders represented by the Trust.

[18]The plaintiff's cross appeal from the denial of his application for interest and counsel fees falls in light of our main decision; there is no merit in his cross appeal from the allowance of the defendants' motion to extend time to file a notice of appeal.