GEORGE E. HASKELL *vs.* VERSYSS LIQUIDATING TRUST.

No. 07-P-1854.

Norfolk. January 5, 2009. - August 28, 2009.

Present: CYPHER, BERRY, & KATZMANN, JJ.

*Practice, Civil,* Findings by judge, Burden of proof. *Evidence,* Expert opinion. *Corporation,* Valuation of stock. *Interest.*

In a Superior Court action brought by a plaintiff seeking a judgment declaring that he was entitled to full ownership of a number of shares of stock of a certain corporation pursuant to the terms of a letter agreement (agreement), which required the plaintiff (the corporation's former president and chief executive officer) to turn back those shares if the stock did not reach a specified investment value at the time of his resignation, the judge, in entering judgment in favor of the corporation, properly determined that the plaintiff, as the party invoking the valuation condition to avoid his contractual duty of turning back the shares, bore the burden of proof on that issue [126-127]; further, the judge properly discredited the plaintiff's expert's opinion regarding the investment value [127-128], and the judge's finding that the stock value had not reached the investment value specified in the agreement was warranted by the evidence and involved no error of law [128-129].

The defendant in a civil action could not move under Mass.R.Civ.P. 60(a) for an award of statutory postjudgment interest more than ten days after entry of judgment. [129-130]

CIVIL ACTION commenced in the Superior Court Department on August 7, 1995.

Following review by this court, 61 Mass. App. Ct. 824 (2004), the case was heard by *Judith Fabricant,* J.

*Tory A. Weigand (Anthony Abeln* with him) for the plaintiff.

*John D. Hanify* for the defendant.

KATZMANN, J. This case has a long history. In 1995, plaintiff George E. Haskell initiated a proceeding against the defendant, the Versyss Liquidating Trust (Trust), seeking a declaration that he is entitled to full ownership of 1,266,300 shares of stock in

Versyss, Inc. (Versyss).[1] In 2000, a Superior Court judge, after a jury-waived trial, found in favor of Haskell. On appeal by the Trust, we reversed and remanded the case to the Superior Court for further proceedings. See *Haskell* v. *Versyss Liquidating Trust*, 61 Mass. App. Ct. 824 (2004). After a second jury-waived trial, a different Superior Court judge entered a judgment for the Trust.[2] Haskell now appeals. The question presented in this appeal is whether the judge in the second proceeding properly determined that the value of the Versyss stock was less than $1.50 per share at a date set forth in a Letter Agreement between the parties such that Versyss properly canceled Haskell's 633,150 shares of Versyss stock. We also consider the Trust's contention that it is entitled to an award of statutory postjudgment interest on the value of the shares of stock held in escrow during these proceedings.

I. *Background.* In 1993, Versyss,[3] an industry leader in the practice management software field, was having serious financial problems. At that time, Russell Keene (Russell), son of Versyss's founder David Keene, and Neil Harte, a long-time advisor to the Keene family, asked Haskell to join Versyss full-time as its president and chief executive officer (CEO).[4] In return for his employment with Versyss, and apart from salary, Haskell would receive ten percent of Versyss common stock, with half of the shares (633,150 shares) vesting immediately, and the other half to

[1]On May 8, 1996, by an uncontested motion under Mass.R.Civ.P. 25(c), 365 Mass. 771-772 (1974), the Trust, as the "real party in interest," substituted for and succeeded Versyss as the defendant in this matter. The Trust represents the interests of the former shareholders of Versyss, particularly in the distribution of proceeds from the merger due to them.

[2]At the second trial the only claim at issue before the judge was that for declaratory judgment. Haskell's original complaint included a claim for breach of fiduciary duty (count I), a claim for declaratory judgment (count II), and was later amended to add a claim for breach of contract (count III). Count I, the breach of fiduciary duty claim, was disposed of on summary judgment. After the first trial, a judgment entered for Haskell on count II of the complaint, and for Neal Harte (a defendant in the original trial) on count I of the complaint. The remaining claims and counterclaims were dismissed with prejudice.

[3]Versyss was a closely held corporation with a majority of its shares controlled by three shareholders. As of 1993, the company had 1,000 employees and $100 million in annual revenues.

[4]Prior to this offer, Haskell ran a consulting firm, which had advised Versyss on a number of occasions.

vest when the per share value was at or above $1.50. Haskell agreed, and he was elected to the board of directors on April 22, 1993. On May 11, 1993, the board elected him as president and CEO.

On December 14, 1993, Versyss and Haskell entered into a "Stock Purchase and Restricted Stock Agreement" (SPA).[5] The SPA granted 1,266,300 common shares (ten percent of all outstanding common shares) of Versyss stock to Haskell. Pursuant to the SPA, one-half of the shares (633,150) vested immediately, with the balance to vest upon the occurrence of certain contingencies, the most notable of which provided for vesting when the common stock attained a fair market value of $1.50 per share, at any time prior to November 1, 1995. The shares could also vest if Haskell was terminated or if a change of control of the corporation occurred prior to that same date.

At the January 11, 1994, board of directors' meeting, the SPA was accepted. A stock certificate, dated December 14, 1993, was issued to Haskell for 633,150 shares. On February 11, 1994, due to potentially adverse tax consequences for Haskell and Harte,[6] the board rescinded the SPA and stock transfer.[7] The board then resolved to issue 1,266,300 shares (the full ten percent of all outstanding common stock) to Haskell without the restrictions of the SPA.[8] However, the stock certificates were not issued at that time.

Haskell and Harte subsequently agreed to restrict the new grant of shares by way of a letter dated March 14, 1994 (Letter Agreement). The Letter Agreement was addressed to Versyss's

[5]Between April and December of 1993, numerous documents were prepared summarizing agreements between Haskell, Harte, and Versyss regarding stock grants. The details of these documents are recounted in *Haskell* v. *Versyss Liquidating Trust, supra.*

[6]Harte was also a member of the board of directors and was voted five percent of the common stock subject to the same conditions as Haskell.

[7]Haskell and Harte could have avoided the unfavorable tax consequences by filing an election pursuant to § 83 of the Internal Revenue Code, 26 U.S.C. § 83(b), within thirty days of the grant of stock. Neither of them did so. The code required the elections to be filed by January 13, 1994 (thirty days after the shares were issued on December 14, 1993). Harte failed to file a timely election, while Haskell mailed his election more than thirty days from December 14, 1993.

[8]Harte was to be issued 633,150 shares (five percent of the outstanding shares of common stock).

three majority shareholders and was signed by Haskell and Harte. It stated, in relevant part:

> "It is understood by the undersigned that in the event that VERSYSS common stock does not reach the valuation of $1.50 per share as determined by an independent, outside valuation firm prior to our voluntarily vacating our positions at VERSYSS, that we agree to turn back one-half of our issued common stock to the Company and relinquish all claims regarding said stock in the future."

Subject to the terms of this Letter Agreement, stock certificates were issued on April 15, 1994, backdated to May 11, 1993.

Under Haskell's leadership, Versyss's financial outlook began to brighten. However, over the course of the next year, a rift developed between Haskell and Harte, centering on whether to put the company up for sale or to seek outside investment.

In the fall of 1994, Harte rejected a proposed investment by Alex Brown & Sons, Inc. (ABS), to the consternation of Haskell.[9] For the next several months, Versyss was involved in ongoing negotiations with a competitor, Medic Computer Systems, Inc. (Medic), regarding Medic's acquisition of Versyss. Medic's offer price was somewhere in the region of $1.80 per share.[10] However, Haskell and others in the company feared that Versyss could not meet the contingencies required by this offer. These negotiations continued sporadically until May of 1995. In the meantime, Versyss also received and rejected an acquisition offer from a different competitor, CUSA. The apparent reason for these offers was the value of Versyss's customer base, which gave the company a greater value than that reflected by its balance sheet.

Due to the ongoing deterioration of his relationship with Harte, Haskell stated his intention to resign. In a letter dated

---

[9]The proposed investment provided that, in return for investment in Versyss, ABS would receive approximately sixty percent of Versyss stock. According to Russell's analysis, ABS would invest an amount equivalent to $0.70 per share of common stock, without Versyss shareholders receiving any cash for their shares.

[10]The price was found by the judge, on remand, to be approximate, "because of changes over time in the value of Medic shares, which Versyss shareholders would have received, and because of complexities in accounting for redemption of preferred shares and other interests."

February 17, 1995, Haskell stated this intent but offered to remain with the company through a transition period under certain conditions. One condition read:

> "I want my stock to be free of the $1.50 value letter under the circumstances I am agreeing to. Therefore, by this agreement, I will have no conditions on my [ten percent] ownership portion. In addition, I have fully paid for my stock."

The board did not agree. On February 22, Haskell resigned under protest.

The board responded by way of letter, dated March 8, 1995, stating that it would be amenable to negotiating a termination package, but also noted that "[i]n the absence of such an arrangement, we have no choice but to abide by the terms of the arrangement concerning your stock, and we intend to take appropriate action to cancel half of your shares." A termination package never materialized. Neither party initiated a valuation process for the shares of stock at that time.

Meanwhile, David Keene's widow passed away in March of 1995. Within the next few months, the company retained Howard J. Gordon (Gordon) of Gordon Associates, Inc., to value the Versyss shares relating to her estate. In addition, the company asked Gordon to calculate a price at which it might buy back the shares of a former executive.[11] Gordon's report, issued on September 7, 1995, valued Versyss common stock at $.02 per share as of March 1, 1995. Gordon arrived at that figure by analyzing the company's financial data through the end of 1994, and comparing that data with similar companies. Gordon testified that there would be no difference in his process for determining the value of shares relating to the Keene estate or an executive buy back.

After Haskell's departure, in a cost-saving move, Versyss did not replace him. Instead, Harte became the acting CEO. The company continued to make additional positive financial improvements, paying down debt and collecting accounts receivable. Cash flow improved, and over the first two quarters of 1995, Versyss continued to turn a small profit.

---

[11]The judge found that this request was made after Haskell filed suit.

In late June of 1995, Versyss began negotiations for acquisition by Physicians Computer Network (PCN). The transaction was approved by Versyss shareholders on October 25, 1995, for a purchase price of $1.52 per share: $0.17 per share at the time of closing, and the remainder to be paid in the form of notes payable over two years.[12]

II. *Discussion.* At issue here are the outstanding proceeds held in escrow that resulted from the disputed five percent of Versyss shares issued to Haskell. On appeal, Haskell argues that the judge committed error in finding that (1) it was Haskell's burden, and not the Trust's, to prove that the investment value of the corporate stock exceeded $1.50 a share,[13] and (2) the value of the stock, as of the date of Haskell's resignation, did not reach an investment value of $1.50 per share; therefore, Versyss was entitled to cancel one-half of Haskell's shares.

A. *Standard of review.* Massachusetts Rule of Civil Procedure 52(a), 365 Mass. 816 (1974), provides that "[f]indings of fact shall not be set aside unless clearly erroneous." "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Millennium Equity Holdings, LLC* v. *Mahlowitz,* 73 Mass. App. Ct. 29, 36-37 (2008). "In applying the clearly erroneous standard to findings of a [judge] sitting without a jury, appellate courts must constantly have in mind that their function is not to decide the factual issues de novo." *First Pennsylvania Mort. Trust* v. *Dorchester Sav. Bank,* 395 Mass. 614, 621 (1985).

As valuation is a question of fact, the judge's determination of value will stand, unless clearly erroneous. *Bernier* v. *Bernier,* 449 Mass. 774, 785 (2007). *Fechtor* v. *Fechtor,* 26 Mass. App. Ct. 859, 863 (1989). Furthermore, deference is given to the trial judge's credibility assessments of experts. See *Fechtor, supra.* See also *Commonwealth* v. *Cullen,* 395 Mass. 225, 229 (1985)

---

[12]The shareholders also approved an agreement creating the Trust to represent the interests of former Versyss shareholders in the proceeds due from the PCN merger.

[13]The proper measure for the value of the stock is not at issue on appeal, since Haskell agrees with the judge's determination (and the Trust does not dispute) that the stock here is measured by its "investment value."

(within discretion of fact finder to place little or no weight on expert evidence).

B. *Burden of proof*. Haskell contends that the judge erred in holding that he had the burden of proving that the value of the stock reached an investment value of $1.50, the condition stated in the Letter Agreement. Haskell argues that the Trust should be the party bearing that burden because it is the Trust, and not Haskell, who seeks to enforce the Letter Agreement and cancel Haskell's shares. Specifically, Haskell claims that because the Letter Agreement established a condition precedent (or in the alternative, condition subsequent) for turning back the shares, the Trust bore the burden of demonstrating that such condition did not occur prior to the time Haskell departed in order to cancel Haskell's shares.

In a declaratory judgment action, the determination concerning which party has the burden of proof depends on the nature of the underlying action. See *Stop & Shop, Inc.* v. *Ganem*, 347 Mass. 697, 703-704 (1964). We conclude that there was no error in the judge's careful analysis of the particular circumstances of this case and her determination that Haskell had the burden of proof.

In arriving at her conclusion, the judge observed correctly that the archaic cases, presented by Haskell to support his arguments, do not lead to the result that Haskell seeks. Those cases provide that one relying on a condition to avoid a contractual obligation has the burden to prove the occurrence of the condition. See *Gray* v. *Gardner*, 17 Mass. 188, 189 (1821); *Thayer* v. *Connor*, 5 Allen 25, 26-27 (1862); *Cluff* v. *Mutual Benefit Life Ins. Co.*, 13 Allen 308, 316 (1866); *Perley* v. *Perley*, 144 Mass. 104, 107 (1887). Here, as the judge correctly noted, the Letter Agreement placed the condition on Haskell, not on the company: Haskell should return one-half of his stock issued unless the condition, stated in the Letter Agreement, has been met. See part I, *supra*. Thus, it is Haskell, not the company, who invoked the condition to avoid the contractual duty of turning back the shares and, therefore, had the burden of proof.

Further, the judge committed no error in disregarding Haskell's argument that the Trust should bear the burden of proof as it sought to alter the status quo and effect a cancellation of the

stock. See *Cluff, supra*; *Eliot Discount Corp.* v. *Dame*, 19 Mass. App. Ct. 280, 285 (1985). Haskell's voluntary assumption of the risky obligation that now results in the cancellation of stock did not amount to any change in the status quo by the Trust. In sum, Haskell had the burden to establish that the stock had reached $1.50 per share as of the date of his resignation.[14]

C. *Stock valuation.* Haskell next asserts that the judge's finding concerning the value of stock was clearly erroneous, as the investment value of the stock was at least $1.50 per share at the time of his departure.

1. *Haskell's expert witness.* Specifically, Haskell contends that the trial court erred in rejecting his expert's opinion of an investment value of $2.47 per share based on the comparative public companies method. "Due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Mass. R.Civ.P. 52(a). The trial judge is free to accept one opinion of a valuation expert and reject another. *Bernier*, 449 Mass. at 785. *Fechtor*, 26 Mass. App. Ct. at 863. The judge may also decide not to adopt the opinion of any expert and determine valuation based on other evidence. *Fechtor, supra. BNE Mass. Corp.* v. *Sims*, 32 Mass. App. Ct. 190, 194 (1992). "The judge may not, however, reach a valuation that is materially at odds with the totality of the circumstances." *Bernier, supra.*

Here, the judge had carefully considered the testimony of Joseph Debra, Haskell's expert witness. She duly noted that Debra had extensive training and experience with respect to business valuation. However, the expert's opinion was rejected for three reasons. First, Debra's credibility was weakened by the fact that he was aware of the outcome that would serve Haskell's interest prior to reviewing all the relevant documents and forming his opinion. Second, Debra formed his opinion focusing primarily on the Medic offer of $1.92 per share that occurred on February 28, 1995, shortly after Haskell's departure. However, in analyzing the Medic offer as a measure of value, Debra did not consider the contingencies of that offer. We agree with the judge that

---

[14]Additionally, we agree with the judge's conclusion that even if the burden was on the Trust, the result would be the same, as the preponderance of evidence demonstrates that the value of the stock had not reached the required level. See discussion, *infra*.

contingencies affect value and, therefore, it was reasonable for the judge to discredit the expert's testimony on that basis.[15] Third, the judge reasonably concluded that the comparative public companies method — employed by Debra — was implausible as it only considered the companies' assets without accounting for liabilities. Giving due deference to the trial judge and finding no error in her conclusions, we hold that the testimony of Haskell's expert was properly discredited.

2. *PCN transaction.* Haskell next claims that the PCN transaction, valuing the stock at $1.52 per share, unequivocally established that Versyss stock was worth at least $1.52 at the time of his departure. The trial court rejected the PCN valuation because it found that Versyss's value increased between the time of Haskell's departure and the time of PCN's valuation of Versyss.

Versyss signed a letter of intent with PCN in July of 1995,[16] and the Versyss shareholders approved the deal in late October of 1995. As of July, 1995, Versyss had enjoyed several profit-

---

[15]The Trust notes that Medic withdrew its offer because of its concerns regarding Versyss's financial condition that came to light through due diligence. With regard to the rejection, John McConnell, Medic's president and CEO, wrote:

"After evaluating the material that has been provided by Versyss, I feel that MEDIC cannot complete the Definitive Agreement as outlined in our Letter of Intent. . . . In reviewing the financial data, it appears that this revenue is lower than we anticipated and the profit margins are lower."

On the other hand, Haskell argues that McConnell made clear that the offer made in January, 1995, was only withdrawn because his wife died and that it was a "posturing" move. According to McConnell: "The company [Versyss] value did not go down because — that wasn't why I withdrew [initially] from the business . . . . Had I not had the personal situation at that time, I would have bought the company [Versyss] bottom line. . . . I thought that we could buy the company for less money than we originally offered with George [Haskell] being gone. However, I did not think the valuation for the company [Versyss] was less." McConnell, who had acquired five companies between 1985 and 1994, made clear that the value of the company did not go down during the time he was negotiating with Versyss between approximately mid-1994 and 1995.

Despite the conflicting factual presentation with respect to the Medic offer, there is no clear error in the judge's finding that the Medic offer did not conclusively establish that the value of Versyss stock was $1.50 at the time of Haskell's resignation.

[16]This was five months after Haskell's departure.

able quarters; it continued to cut costs and reduce debt, thereby improving its financial condition. Therefore, Versyss's value as of July, 1995, was somewhat more than its value in February of 1995, when Haskell resigned.

Haskell argues that there was no improvement in Versyss's condition between February and July of 1995. While it is true that the client base and market share remained the same, there was sufficient evidence before the trial court to show that several developments — that took place after February of 1995 — improved the company's over-all financial position. Furthermore, the judge properly noted that while the evidence did not support a precise calculation, even a relatively small difference in the company's performance could bring the share value from $1.52 per share to less than $1.50. In sum, we are of the opinion that the judge's findings with regard to the PCN transaction were based on sufficient evidence and therefore not clearly erroneous.[17]

The findings as to the stock value are warranted by the evidence and involve no error of law. Accordingly, we uphold the judge's determination that Haskell is not entitled to relief as the stock at issue did not reach the value of $1.50 at any time prior to his departure.

D. *Postjudgment interest.* Versyss seeks the difference between the interest earned by the funds in the escrow account and the statutory interest that could be assessed from and after June 22, 2006 (the date of the judgment in favor of the Trust). Citing Mass.R.Civ.P. 60(a), 365 Mass. 828 (1974), Versyss requested "that the judgment entered by [the Superior] Court be corrected to specify that postjudgment interest will accrue for [that] period . . . at the rate of 12 percent per annum." The judge denied the motion.

---

[17]We are unpersuaded by Haskell's equity argument as, in light of all pertinent circumstances, it is not inequitable to cancel one-half of Haskell's shares. As the judge noted, if Haskell obtained valuation upon leaving his position, this dispute would not have arisen. When he resigned he did not seek a valuation of the stock; thus, the remaining management reasonably could conclude that Haskell recognized the nonoccurrence of the condition (i.e., stock reaching $1.50), and that no valuation was needed.

Additionally, we reject the Trust's suggestion that the claims asserted in this appeal are frivolous; Haskell's arguments are not wholly insubstantial, as alleged by the Trust, and do not trigger the application of G. L. c. 231, § 6F.

Rule 60(a) permits parties to amend "[c]lerical mistakes in judgments . . . arising from oversight or omission" and may be raised "at any time" by the court or any party. Mass.R.Civ.P. 60(a). *O'Malley* v. *O'Malley*, 419 Mass. 377, 379 (1995). *M.B. Claff, Inc.* v. *Massachusetts Bay Transp. Authy.*, 441 Mass. 596, 602 (2004). Haskell claims that Versyss's request for postjudgment interest is a substantive matter that exceeds the scope of a "clerical mistake" under Rule 60(a). He contends that the relevant rule is Mass.R.Civ.P. 59(e), 365 Mass. 828 (1974), which provides that "[a] motion to alter or amend the judgment shall be served not later than 10 days after entry of judgment." He argues that Versyss's motion cannot be entertained because it was not served within ten days after the entry of judgment.

The judge made no mention of postjudgment interest in her judgment in favor of the Trust on June 26, 2006. Haskell correctly contends that Versyss waived any right or claim to interest when the parties entered into a stipulation prior to the judgment of July, 2001. We note that the stipulation, incorporated into the judgment, resulted in the declaratory judgment as the sole issue in the first appeal. The July, 2001, judgment expressly stated that "no interest, costs or fees are to be awarded to the plaintiff or the defendant." Any argument now that statutory postjudgment interest must be included in the judgment is a substantive claim that cannot be raised by a rule 60(a) motion, and is, in fact, waived.[18] The Trust is not entitled to postjudgment interest at the statutory rate.

*Conclusion.* For the foregoing reasons, we affirm the June 22, 2006, judgment for the Trust.

*So ordered.*

---

[18]Given our determination that the July, 2001, judgment is dispositive, we need not address Haskell's arguments regarding judicial estoppel and G. L. c. 235, § 8.