Kaplan, Mitchell H., J.
This action involves a dispute between two attorneys. The defendant, Joseph J. Cariglia, Esquire, asserts an interest in a contingency fee that plaintiff, Philip T. Soloperto, Esquire, collected for representing his clients, Leszek and Halina Witek, in a wrongful death claim. Cariglia was counsel to the Witeks, the parents of the decedent, but was fired and replaced by Soloperto, who became successor counsel. Following the settlement of the wrongful death claim, Soloperto accepted financial responsibility for any sums that the Witeks might owe Cariglia, the contingent fee was placed in escrow so that the net proceeds of the settlement due the Witeks could be distributed, and Soloperto filed this declaratory judgment action to determine the amount, if any, due Cariglia. The case was tried to the court, jury waived, on March 10, 2010. Three witnesses testified. The record remained open thereafter as the plaintiff offered excerpts of the deposition of the defendant, but had not identified those excerpts prior to trial, and the defendant requested the opportunify to introduce other parts of the transcript, as permitted by Mass.R-Civ.P. 32(a)(4). The transcript of the deposition excerpts designated by both parties have been submitted and received in evidence and the record closed. In consideration of the testimony, both live and by deposition transcript, exhibits admitted into evidence, and the arguments of counsel, the court makes the following findings of fact and rulings of law and orders that final judgment enter as stated herein.

FINDINGS OF FACT

Jessica Witek died in an automobile accident on November 25, 2004. She was a passenger in a vehicle driven by her boy friend, James Bazinet. The Bazinet vehicle was traveling west bound on the Massachusetts Turnpike. Bazinet abruptly changed lanes and was struck by another west bound vehicle driven by John Paul Soucy. The Bazinet vehicle crossed the median strip and came to rest in the east bound lane. Jessica, who was apparently not wearing a seat belt, was ejected and died instantly. At the time of her death, Jessica was an adult, living apart from her parents in Springfield.
The automobile driven by Bazinet was owned by his mother and insured by Commerce Insurance Company. Bazinet’s own insurance policy had previously been canceled, and he was not listed on his mother’s Commerce policy as an operator of the vehicle. Commerce denied coverage. Soucy was a resident of Maine. His vehicle was leased to a business that he owned in Maine, the Bangor Athletic Club. The vehicle was insured with Liberty Mutual Insurance Company through a policy issued in Maine. The coverage page of that policy identified Soucy and his wife as the insureds and disclosed bodily injury liability coverage for the vehicle involved in the accident, and for a second car, with limits of $250,000 for each person and $500,000 for each accident. Jessica was, herself, covered by an automobile insurance policy issued by Arnica Mutual Insurance Company which provided underinsured coverage with a limit of $50,000.
Bazinet’s liability was never in doubt. Indeed, criminal charges were filed against him, although the resolution of those charges were not offered in evidence in the instant case. There was also evidence that the Soucy vehicle was traveling at excessive speed.
Jessica’s parents, Leszek and Halina Witek, met with personnel and lawyers who worked in Cariglia’s office, and with Cariglia himself, not long after the accident. The Witeks signed a contingent fee agreement with Cariglia on December 3, 2004, apparently for representation in connection with Jessica’s death, although that agreement was not placed in evidence. *27 Thereafter, Cariglia, or more likely others who worked for him (Cariglia could not recall), provided the following services in connection with the claim: sent letters requesting a police report of the accident and expenses relating to Jessica’s funeral; spoke by telephone with an accident reconstruction specialist; corresponded with Commerce and Liberty and determined policy limits, recovered PIP benefits, prepared and filed a petition for the appointment of the Witeks as voluntary administrators of Jessica’s estate with the Hampden County Probate Court, and filed a complaint on behalf of the Witeks, as administrators, in the Superior Court.
Cariglia kept no time records of his services and declined to estimate the amount of time that he and other associate attorneys or staff spent on the matter. He also elected to offer no evidence with respect to reasonable billing rates to be applied to the work done by him or others in his office. Cariglia testified concerning a computer system that was developed for his office on which information gathered from a case could be entered and then efficiently retrieved, but did not offer in evidence a printout from that system with respect to the Witeks’ case. Finally, Cariglia did not offer in evidence his file from the Witek case, which presumably would have provided some insight into the scope of work done for the Witeks, the dates on which it was performed, and who did it.
There is no evidence that Cariglia made a demand on the defendants in the case he filed on behalf of the Witeks or their insurers, or received an offer in settlement with respect to the Witeks’ claim while he represented them.
On January 10, 2005, the Witeks met with Soloperto and retained him to represent them in connection with Jessica’s death.[1] On January 13, 2005, Soloperto sent Cariglia a letter explaining that the Witeks were discharging Cariglia and retaining him to represent them. He later sent Cariglia a check reimbursing Cariglia for out of pocket expenses incurred in representing the Witeks.
Over approximately the next seven months Soloperto represented the Witeks in the resolution of their claims. Among other tasks, he dismissed the petition for voluntary administration that the Cariglia office had filed on behalf of the Witeks in the Hampden Probate Court and the wrongful death suit that they filed as voluntary administrators, because voluntary administrators do not have standing to prosecute wrongful death claims on behalf of the estate of a deceased. See Marco v. Green, 415 Mass. 732, 739 (1993) (“[A] voluntary administratrix acting pursuant to [G.L.c. 195], §16 possesses no authority to bring a wrongful death claim, or to settle one”).[2] Soloperto prepared and filed a petition for Administration Without Sureties, with the assents of all of Jessica’s heirs at law and next of kin, on the Witeks’ behalf. In late August 2005, Soloperto settled the Witeks’ claims arising out of Jessica’s death. Liberty paid $250,000, the amount which Liberty maintained was its maximum liability under its policy covering Soucy. Arnica paid $50,000, its policy limits for underinsured coverage under Jessica’s policy. Soloperto disbursed $200,000, less expenses, to the Witeks and, as noted above, placed the balance with an escrow agent, because Cariglia claimed an interest in the fee, and assumed responsibility for any sums that the Witeks may be found to owe Cariglia on account of his representation of them.
Soloperto testified that, like Cariglia, he does not record his time on contingent fee matters. Soloperto however reconstructed the work that he did on the Witek matter and estimated that he worked something in excess of forty hours on it. Among other things, he developed a theory that, under Maine law, Liberty’s exposure on the policy issued to Soucy might be $500,000 and was prepared to litigate the issue. However, the Witeks did not want to pursue litigation and preferred to settle for the sums being offered by the insurers. The Witeks also told Soloperto that they did not wish to pursue the personal (or business assets) of Soucy or Bazinet.

DISCUSSION

The underlying dispute in this action is whether the Witeks, having terminated Cariglia before the occurrence of the contingency that would establish a right to payment under the agreement, i.e., the resolution of the claims that Cariglia had been retained to prosecute, owe Cariglia any money for services that he rendered on their behalf, and, if so, in what amount. The fact that Soloperto agreed to accept responsibility for any such sum and to place the contingent fee that he was due on the resolution of the Witeks’ claims into an escrow account does not alter the nature of the claim to be resolved — Cariglia’s quantum meruit claim to be paid for services rendered the Witeks. See Malonis v. Harrington, 442 Mass. 692, 701 (2004) (“The general rule in Massachusetts is that, on discharge, an attorney has no right to recover on the contingent fee contract, but thereafter, the attorney may recover the reasonable value of his services on a theoiy of quantum meruit”). Further, the fact that Soloperto filed this declaratory judgment action to determine if he, having accepted this potential liability, owes any sum to Cariglia does not cause the burden of proof to shift. It is Cariglia’s burden to prove the elements of his quantum meruit claim. See Haskell v. Versys Liquidating, 75 Mass.App.Ct. 120, 126 (2009) (“In a declaratory judgment action, the determination concerning which party has the burden of proof depends on the nature of the underlying action”), citing, Stop & Shop, Inc. v. Ganem, 347 Mass. 697, 703-04 (1964).
What has Cariglia proved regarding the value of the services that he rendered to the Witeks? Cariglia points to the SJC’s comment in Malonis regarding how the fair value of an attorney’s services may be deter *28 mined: “There are multiple factors to be considered in determining what is an attorney’s fair and reasonable measure of compensation in a case. Relevant factors include not only time spent, but the amount of the recovery and the attorney’s impact on the actual outcome. See Mulhern v. Roach, 398 Mass. 18, 24, 30 (1998).” 442 Mass. at 699, n.9. Cariglia argues that during the five weeks that he represented the Witeks he identified the insurance carriers who covered Jessica and the drivers of the vehicles involved in the crash and the limits of the relevant coverages: that was all a competent attorney needed to settle the case, because as a result of Jessica’s death, the amount of the loss would exceed the available coverage. It seems that Cariglia made a conscious decision to forego any reliance on the other factors that Malonis and, to a greater extent Mulhern, point out are relevant to a determination of the amount of the fee due a discharged attorney under these circumstances. See Mulhern, 398 Mass. at 24. (“In determining what is a fair and reasonable charge to be made by an attorney for his or her services, ‘many considerations are pertinent, including the ability and reputation of the attorney, the demand for his services by others, the amount and importance of the matter involved, the time spent, the prices usually charged for similar services by other attorneys in the same neighborhood, the amount of money or the value of the property affected by controversy, and the results secured.’ ”) [Internal citations omitted.]
In this case, while Cariglia may well be correct that during the brief period that his office provided services to the Witeks, he learned all the information that was required to achieve the same result that Soloperto achieved for the Witeks in August, it took no particular skill or effort to acquire that information, which consisted only of identifying who was driving the cars involved in the crash and who insured the drivers. Indeed, to the extent that the evidence reveals anything about how long it took Cariglia’s office to acquire this information, it may well have required no more than an hour or two. It is not clear that Soloperto even relied on the information already accumulated by Cariglia when he took over the matter, although he may have. Soloperto certainly could have acquired the information with no more effort than Cariglia expended. Soloperto spent some time developing the underlying facts concerning the manner in which the accident occurred through contact with the District Attorney’s office that was prosecuting Bazinet and a theoiy pursuant to which Liberty could be liable for twice the coverage amount that it agreed to pay. The Witeks, however, apparently wanted the matter concluded promptly without any litigation. Therefore, in the end, Soloperto concluded a settlement in which Soucy’s carrier offered what it conceded was its maximum coverage exposure resulting from the accident and Jessica’s carrier did the same. Soloperto was then entitled to the sum due him under his contingent fee agreement with the Witeks.
This case certainly must be distinguished from a situation in which an attorney spends substantial time, and employs much skill and ingenuity, to put a case in a posture for a substantial settlement, only to be discharged by his client, who retains successor counsel that concludes the case in reliance on the fruits of the labor of the discharged lawyer. The court rejects Cariglia’s suggestion that since both he and Soloperto, theoretically, contributed equally to the settlement that was achieved, he is entitled to half the fee. That is not what either Mulhern or Malonis teaches. Soloperto’s fee is governed by contract. He might well have litigated for years pursuing his theoiy for a greater recovery from Liberty, but in the end achieved the same result for the Witeks. On those facts, Cariglia’s argument would entitle him to half the contingent fee, even if Soloperto had spent a thousand hours on the case.[3]
Turning to the factors that Malonis and Mulhern direct the court to consider, Cariglia certainly has a substantial reputation for representing plaintiffs in motor vehicle accident claims, but Cariglia also testified that he has a substantial staff of associate attorneys and other personnel and there is no evidence that he was unable to accept the representation of another client or had to defer work for another client because of his brief representation of the Witeks. Cariglia chose to offer no evidence of the amount of time spent representing the Witeks; and some of the work performed by his office was without value because the voluntary administration petition that he caused to be filed had to be dismissed.[4] Cariglia also elected not to introduce evidence of the billing rates that reasonably could be charged for the work done by him or others in his office.
The court also finds that Cariglia’s efforts had “no impact on the actual outcome,” other than acquiring the PIP benefits. There is no evidence that the fact that Cariglia identified carriers and coverages had anything to do with their willingness to pay policy limits; Cariglia offered no evidence that he made demand and began negotiating settlement before he was discharged.
The remaining factor is the “amount of the recovery,” which in this case was $300,000. Malonis does not explain how this factor should be applied in the circumstances presented by this case. The fee generated by the case was substantial, especially when measured against the time expended by either of the attorneys who represented the Witeks. The “amount of recoveiy” factor therefore suggests that Cariglia is due some payment for the services that he rendered.
The court finds that $15,000 represents fair value for Cariglia’s services to the Witeks under the facts and circumstances presented by this case.

*29
ORDER

For the foregoing reasons, the Court hereby orders that judgment enter:
1. Declaring that $15,000 of the fee that Soloperto collected in the Witek matter is due Cariglia:
2. Directing the parties jointly to inform the escrow agent to distribute $85,000 from the escrow fund to Soloperto and $15,000 to Cariglia; any interest net of expenses in the fund to be distributed proportionally to the distributions of the principal; and
3. Each party to bear his own costs.

 here is no evidence in the record regarding why the Witeks were not satisfied with Cariglia’s representation of them and sought out new counsel.

 Cariglia testified that some insurance companies will make settlement to and accept releases from voluntary administrators. This seems odd, as the Marco opinion expressly holds that voluntary administrators do not have the authority to settle a wrongful death claim and therefore could not tender binding releases to the carriers.

 Cariglia and an expert suggested that other sources of recovery existed that Soloperto could have pursued, but offered no proof that they actually existed. In any event, the court does not find such testimony relevant. There is no evidence that the Witeks were in any way displeased with Soloperto, and questions of the skill with which Soloperto prosecuted the claims are not relevant to a determination of the value of Cariglia’s services, where, as here, there is no evidence that his efforts contributed to the recovery.

 Cariglia testified that he chose this approach in death cases so that he could file suit quickly and obtain discovery. The court questions whether it is appropriate to file a suit knowing that the plaintiffs, as voluntary administrators, are without authority to file or settle such an action. In any event, there is no evidence in this case that discovery was sought or received while the Superior Court action was pending.